In re IDS HOLDING COMPANY, LLC, Debtor.

IDS Holding Company, LLC, Plaintiff,

v.

James Madsen, Defendant.

Bankruptcy No. 02–20740.
Adversary No. 02–2218.

United States Bankruptcy Court,
D. Connecticut.

April 9, 2003.

Irve J. Goldman, Esq., Pullman & Comley, LLC, Stamford, CT, for Plaintiff.

Thomas J. Sansone, Esq., Carmody & Torrance, LLP, New Haven, CT, for Defendant.

*RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I AND DENYING MOTION AS TO COUNTS II THROUGH VI OF THE COMPLAINT*

ROBERT L. KRECHEVSKY,
Bankruptcy Judge.

### I.

IDS Holding Company, LLC, the plaintiff and the debtor in possession in this Chapter 11 case ("IDS"), on May 15, 2002, filed a six-count complaint seeking to recover 13,748 shares of corporate common stock, or their value, from the defendant, James Madsen ("Madsen"). Madsen, on December 16, 2002, filed a motion for summary judgment in his favor on all counts. IDS has filed papers opposing the motion to which Madsen has not replied. The litigation arises from the following background supplied by the parties' statements of material facts as to which there is no genuine issue to be tried. *See* D. Conn. L. Civ. R. 56, made applicable in bankruptcy proceedings by D. Conn. LBR 1001–1(b).

### II.

IDS, organized under the Connecticut Limited Liability Company Act, filed its Chapter 11 petition on March 15, 2002. Prepetition, on December 17, 2001, IDS, then known as The Identiscan Company LLC, entered into an Asset Purchase Agreement ("the Purchase Agreement") to sell substantially all of its assets to Intelli–Check, Inc. ("Intelli–Check"). The consideration for the sale, which took place on or about January 2, 2002, was 59,774 shares of Intelli–Check common stock ("the Intelli–Check shares") with a then approximate value of $980,000. On the date of the sale, IDS was insolvent. Madsen owned a 46–percent interest in IDS, one Peter DiMaria ("DiMaria") owned a like 46–percent interest, and four other individuals each held two-percent interests.

All of the IDS interest holders had executed a document, in October 2001, entitled "Agreement Attendant To The Sale of Identiscan Assets To Intelli–Check" ("the Distribution Agreement"), in which they agreed that the Intelli–Check shares which IDS received on the sale date be immediately distributed to each of them in proportion to their ownership interests. They further agreed that Madsen and the four two-percent interest holders would pledge one-half of their Intelli–Check shares to various named IDS creditors, and DiMaria would, likewise, pledge all of his shares. Madsen thereby retained 13,748 Intelli–Check shares. Madsen further agreed to dismiss his pending lawsuits against one of IDS's suppliers ("ATS") and DiMaria, a condition Intelli–Check mandated in the Purchase Agreement.

Madsen's consent to the asset sale was a prerequisite to IDS entering into the Purchase Agreement, since the IDS operating agreement required a super majority of a two-thirds vote of the IDS ownership interests for such a sale. Madsen conditioned his approval of the sale upon his receiving $230,000 worth of unencumbered Intelli–Check shares for his sole benefit. The stock distribution to Madsen, pursuant to the Distribution Agreement, took place on or about January 2, 2002. As noted, IDS filed its bankruptcy petition on March 15, 2002.

### III.

IDS, in its complaint, contends that the distribution of the 13,748 Intelli–Check

shares of stock (a) violated Conn. Gen.Stat. §§ 34–100 *et seq.* (Connecticut Limited Liability Company Act), and the "absolute priority rule" when assets were distributed to members of the limited liability company without first providing for its creditors (Count I); (b) constituted a fraudulent voidable transfer under Bankruptcy Code § 548 (Count II); (c) is voidable under Conn. Gen.Stat. §§ 52–552a *et seq.* (the Uniform Fraudulent Transfer Act) (Count III); (d) constituted a voidable preference under Bankruptcy Code § 547(b) (Count IV); (e) constituted a voidable preference under Bankruptcy Code § 544(b) and Conn. Gen.Stat. § 52–552(f) (Count V); and (f) amounts to a breach of Madsen's fiduciary duties as a member of IDS to creditors. (Count VI).

Madsen argues he has demonstrated his entitlement to summary judgment. Briefly stated, he contends that since the stock transfer was supported by consideration, it cannot constitute a fraudulent or illegal transfer under either federal or state law; the transfer cannot be deemed preferential, since he was not a creditor; and that evidence is lacking that he breached any duty to IDS creditors.

### IV.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party ha[s] the burden of proving that no material facts are in dispute, and in considering such a motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. The court in deciding a summary judgment motion, cannot try issues of fact, but can only determine whether there are issues of fact to be tried." (Internal quotation marks and citations omitted.) *Hirsch v. Cahill (In re Colonial Realty Co.)*, 210 B.R. 921, 923 (Bankr.D.Conn. 1997).

### V.

### A.

### COUNT I

IDS, in Count I, alleges that Madsen violated Conn. Gen.Stat. § 34–210[1] when the Intelli–Check shares were distributed to Madsen at the time IDS was in the process of winding up. IDS contends that § 34–210 and the absolute priority rule prohibit distribution to members prior to fully paying the company's creditors during a winding up.

Madsen responds that any prohibition concerning distribution of assets to members while a limited liability company is winding up does not apply in this instance because IDS had not dissolved and was not in the process of dissolving. He further argues that, unlike Connecticut statutes which govern corporations, the Connecti-

---

1. Conn. Gen.Stat. § 34–210 provides:

    Upon the winding up of a limited liability company, the assets shall be distributed as follows: (1) Payment, or adequate provision for payment, shall be made to creditors, including, to the extent permitted by law, members who are creditors, in satisfaction of liabilities of the limited liability company; (2) unless otherwise provided in writing in an operating agreement, to members or former members in satisfaction of liabilities for distributions under sections 34–158 and 34–159; and (3) unless otherwise provided in writing in an operating agreement, to members and former members, first, for the return of their contributions and second, respecting their membership interests, in proportions in which the members share in distributions under section 34–158.

cut Limited Liability Company Act does not prohibit the distribution of assets to its members when the company is insolvent.

IDS concedes that Connecticut statutes do not prohibit an insolvent limited liability company from distributing assets to its members, but argues that principles of law and equity, pursuant to Conn. Gen.Stat. § 34–242(b),[2] allow the court to apply Connecticut corporate-law restrictions to limited liability companies. Conn. Gen.Stat. § 33–687(c)[3] specifically forbids a corporation from distributing assets to its stockholders when it is insolvent.

The court need not address the issue of applying, in this instance, corporate-law restrictions to limited liability companies because IDS concedes that it has never actually dissolved. IDS also concedes Connecticut case law does not recognize "defacto dissolution." IDS's claim, in Count I, that Madsen received a distribution during its winding up period is, therefore, factually unsupported. Madsen is entitled to summary judgment in his favor as to Count I.

### B.

### COUNTS II AND III

IDS alleges that the distribution to Madsen is a voidable fraudulent transfer of its assets pursuant to Conn. Gen.Stat. § 52–552e(a)(2)[4] and Bankruptcy Code § 548.[5] Both sections, in essence, provide that a transfer made by a debtor is fraudulent if the transfer was made with actual intent to hinder, delay or defraud any creditor of the debtor, or without receiving a reasonably equivalent value in exchange for the transfer. The parties acknowledge that IDS, while insolvent, made a transfer to Madsen within one year of its bankruptcy petition.

Madsen contends that the transfer to him of the Intelli–Check shares was not fraudulent because it was not done with intent to hinder, delay or defraud a creditor. He asserts, to the contrary, the

---

**2.** Section 34–242(b) provides: "Unless displaced by particular provisions of [the Connecticut Limited Liability Act], the principles of law and equity supplement said sections."

**3.** Section 33–687(c), in pertinent part, provides: "No distribution may be made, if after giving it effect: (1) the corporation [would be insolvent] . . . ."

**4.** Section 52–552e(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or

transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

**5.** Bankruptcy Code § 548(a)(1) provides:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily— (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

transaction was facilitated by those within IDS for the benefit of its creditors and allowed IDS to liquidate assets to satisfy its creditors. IDS asserts that while there may have been no actual intent to defraud IDS creditors when the Distribution Agreement was executed, the effect of such agreement was to delay paying the creditors and first to pay Madsen $230,000 in Intelli–Check shares. IDS claims, therefore, that "this transaction was done with the intent to at least delay creditors of IDS." (IDS Mem. at 11.)

Madsen also argues that IDS received reasonably equivalent value for the transfer in that Madsen dropped his lawsuit against ATS and DiMaria in exchange for his approving the sale of IDS's assets and the receipt of the Intelli–Check shares. IDS contends that whether Madsen gave reasonably equivalent value for his distribution is a question of fact, and not appropriate for summary judgment.

■■■ "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." (Internal quotation marks omitted.) *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir.1993). "[A] determination as to whether the property was transferred with actual intent to hinder creditors involves issues of intent and credibility that were inappropriate for summary judgment and that should be resolved by the fact finder after a trial." (Internal quotation marks omitted.) *Novak v. Blonder (In re Blonder)*, 246 B.R. 147, 151 (Bankr.D.Conn.2000); *see also Bowers–Siemon Chemicals Co. v. H.L. Blachford, Ltd. (In re Bowers–Siemon Chemicals Co.)*, 139 B.R. 436, 445 (Bankr. N.D.Ill.1992) (denying summary judgment because the court could not determine whether reasonably equivalent value was given based upon the record before it);

*Daley v. Chang (In re Joy Recovery Technology Corp.)*, 286 B.R. 54, 75 (Bankr. N.D.Ill.2002) ("The issue of whether a debtor received reasonable equivalent value is a question of fact that must be evaluated as of the date of the transaction.").

The court denies summary judgment as to Counts II and III.

### C.

### COUNT IV

■■■ Madsen contends that IDS's preference count, based upon Bankruptcy Code § 547(b), cannot withstand a summary judgment motion because of failure to establish all of the elements of a voidable preference. Section 547(b)(1) requires a finding that the property had been preferentially transferred "(1) to or for the benefit of a creditor." Madsen asserts that he was not a creditor of IDS, but only an equity security holder, as opposed to a claim holder.

Bankruptcy Code § 101(10)(A) defines "creditor" as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." Section 101(5)(A) defines "claim" as a "right to payment . . . ."

Madsen cites early case law providing that shareholders are equity security holders, not claim holders. *See Corporate Jet Aviation, Inc. v. Vantress (In re Corporate Jet Aviation, Inc.)*, 27 B.R. 870, 871 (Bankr.N.D.Ga.1983) (finding that a stockholder's redemption of stock was not a preferential transfer because the stockholder's action was that of an equity security holder, not a claim holder); *In re Pine Lake Village Apartment Co.*, 21 B.R. 478, 480 (Bankr.S.D.N.Y.1982) (finding that partners in a limited partnership were not creditors, stating that "[s]imply put, an equity interest is not a claim against the

debtor for which the equity holder may assert a right to payment").

Such rulings do not imply that a shareholder cannot also have a claim against the company in addition to being an equity security holder. "There is no provision in the Bankruptcy Code that a limited partner with an equity security interest cannot also have an independent claim within the definition of 101(4) arising out of the same instrument." *In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469, 474 (D.D.C.1990) (providing that "the definitions of 'creditor' and 'equity security holder' are [not] mutually exclusive").

In *St. Charles*, the court noted that the partnership agreement at issue indicated that certain limited partners were entitled to guaranteed payments from the partnership that were in addition to and separate from their equity security interests of profit sharing. *See id.* at 473–74. The court, in examining the Bankruptcy Code's definition of "claim," concluded that those guaranteed payments constituted a claim because they were a "right to payment" from the debtor. *See id.* The court distinguished *Pine Lake*, noting that "nothing in *Pine Lake* suggests that the partners in that case were asserting any rights beyond a general expectation to share in profits as equity security holders," whereas the facts of *St. Charles* involved partners who claimed a "legal entitlement to the guaranteed payments regardless of the debtor's earning of profits." *See id.* at 474.

It is undisputed that Madsen was an equity security holder. The pertinent issue is whether Madsen, by virtue of the Distribution Agreement, was also a claim holder. Connecticut statutory law concerning limited liability companies provides an answer. Conn. Gen.Stat. § 34–161 states: "At the time a member becomes entitled to receive a distribution, the member has the same status of, and is entitled to all remedies available to, a creditor of the limited liability company with respect to the distribution." The court concludes that when Madsen, upon execution of the Distribution Agreement, became entitled to receive Intelli–Check shares, Madsen became a creditor of IDS.

The court denies summary judgment as to Count IV.

### D.

### COUNT V

Madsen has failed to make any argument in his papers as to why the court should grant him summary judgment as to Count V. The court denies summary judgment as to Count V.

### E.

### COUNT VI

Count VI alleges that Madsen's actions in obtaining the Intelli–Check shares breached his fiduciary duty to creditors. Madsen argues that he owes no duty to IDS creditors, and that even if such a duty exists there is no basis for concluding that he violated such duty. IDS asserts that Madsen, as the holder of a dominant and controlling interest in IDS owed a fiduciary duty to IDS creditors because of IDS's insolvency.

■ Although the parties have not located case law on point with respect to limited liability companies, as to corporations "[t]he general rule is that directors and officers do not owe a fiduciary duty to creditors of a corporation, except under special circumstances such as when the corporation is insolvent." *Joy Recovery,* 286 B.R. at 81. "From the moment a corporation becomes insolvent, its assets are deemed to be held in trust for the benefit of creditors. The rationale for this view is that directors of an insolvent corpo-

ration have special knowledge that is unknown to creditors." *Id.; see also Bennett Restructuring Fund, L.P. v. Hamburg,* No. X02CV010167682S, 2003 WL 178753, at *21 (Conn.Super.Ct., Jan.2, 2003) ("When ... a corporation becomes insolvent or nearly insolvent, the Delaware courts have recognized that the interests of creditors in the assets of the corporation become senior to those of the corporation's shareholders, for it is from those assets that the corporation's debt to its creditors must be paid. The law thus imposes a constructive trust upon those assets for the benefit of all creditors, and a fiduciary duty upon the corporations's officers and directors to preserve those assets for the benefit of creditors.")

■ The court concludes that Madsen, as a dominant interest holder in IDS, a company with attributes similar to a closely held corporation, owed a fiduciary duty to IDS creditors when IDS became insolvent. The court denies summary judgment as to Count VI.

## VI.

### *CONCLUSION*

For the aforementioned reasons, the court grants interlocutory[6] partial summary judgment to Madsen as to Count I, and denies summary judgment as to the remaining counts. It is

SO ORDERED.

---

**6.** A partial summary judgment order that leaves disputes unresolved is an interlocutory order. *See Robinson v. Robinson (In re Rob-inson),* 194 B.R. 697, 700 (Bankr.N.D.Ga. 1996).