United States Court of Appeals
Fifth Circuit

**F I L E D**

**December 7, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————

No. 03-11268

———————————

JOHN CARRIERI, ANTHONY CARRIERI,
STEVEN M. ELLIOTT, DAVE SERGEANT,
MICHAEL SLENTZ, AND SEAN SLENTZ,

Appellants

-vs-

JOBS.COM INC., ET AL.

Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER and PRADO, Circuit Judges, and LITTLE[*], District Judge.

LITTLE, District Judge:

This appeal centers upon the interpretation of § 101(16)(C) of the Bankruptcy Code. That provision states that "equity security" means "warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest. . . ." 11 U.S.C. § 101(16)(C) (2000). This appeal requires us to decide issues of apparent first impression in this circuit.[1] The primary

---

[*] District Judge of the Western District of Louisiana, sitting by designation.

[1] Although one of the older Fifth Circuit cases cited by the Debtor supports our decision, it is not squarely on point as it deals more with subordination than with "equity securities." See Robinson v. Wangemann, 75 F.2d 756, 758 (5th Cir. 1935) (stating that when a former shareholder owns a promissory note from a bankrupt corporation, received in the redemption of his stock, he "cannot be permitted to share with the other unsecured creditors in the distribution of the assets of the bankrupt estate" but may file a claim that will be subordinate to the claims of other creditors).

issues to be determined are whether the proofs of claims of a group of equity holders that include shares of stock (with a redemption provision) and warrants (with a repurchase provision) are properly characterized as "equity securities" instead of "claims" under § 101(5) and whether these proofs of claims could also give rise to "claims" independent of the equity interests. The district court held that the proofs of claims of the equity holders were "equity securities" under § 101(16)(C), not "claims", that the documents that gave rise to them did not also contain independent "claims", and affirmed the bankruptcy court's order sustaining the objection to these proofs of claims. For the reasons that follow, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This is an appeal from the final judgment of the district court affirming the order of the bankruptcy court disallowing the claims of equity holders in the Jobs.com, Inc., Chapter 11 proceeding. See Carrieri v. Jobs.com, Inc., 301 B.R. 187, 194-95 (N.D. Tex. 2003). The Appellants are the equity holders, John Carrieri, Anthony Carrieri, Steven M. Elliott, Dave Sergeant, Michael Slentz, and Sean Slentz ("Carrieri Group"). The Appellees are the Debtor, Jobs.com, Inc. ("Debtor" or "Jobs.com"), and Arthur J. Kania and the Kania Trust ("Kania Appellees"). The Kania Appellees are preferred equity holders who, investing in Jobs.com after the Carrieri Group, bargained for a higher liquidation preference and whose interests would be adversely affected if we were to reverse the district court.[2]

---

[2] The Kania Appellees held Series E preferred equity interests classified under Class 4 of the Debtor's plan of liquidation and were entitled to a distribution if Classes 1-3 were paid in full. See Debtor's First Amended, Modified and Restated Chapter 11 Plan of Liquidation, dated 24 June 2002, Arts. 4.05(a)-(b), at 11, 5 R. 520. The Carrieri Group held Series C preferred equity interests classified under Class 5 under the Plan, which were deemed cancelled as of the effective date of the Plan without receiving any distribution. Id. at Arts. 4.06(a)-(b). If the Carrieri Group's equity interests, including their redemption and repurchase rights, are deemed to be general unsecured "claims" instead of "equity securities", that would place them under Class 3 and entitle them to a distribution ahead of the Kania Appellees.

We adopt, in relevant part, the bankruptcy court's description of the factual and procedural background. See In re Jobs.com, Inc., 283 B.R. 209, 211-12 (Bankr. N.D. Tex. 2002). The Carrieri Group originally owned the old "Jobs.com" domain name, intellectual property, and other assets, including nearly all of the company's capital stock, which it transferred in a merger to Opportunity Network, Inc. n/k/a Jobs.com on 22 March1999. Under the terms of the Merger Agreement that resulted in the Debtor's creation, the Carrieri Group stockholders had to surrender all their shares of old Jobs.com stock and, in exchange, the Debtor issued new Jobs.com C-1 Preferred Stock ("C-1 Stock") and warrants to each member of the Carrieri Group. As part of the Merger Agreement, the new company issued a Second Amended and Restated Articles of Incorporation ("SARAI") providing that the C-1 Stock and warrants were subject to the terms and conditions of the Statement of Designation, Preferences and Rights of Series C-1 Preferred Stock of Opportunity Network, Inc. ("Statement") (collectively, the "Rights Documents"). The Rights Documents stated that they were issued under authority provided by the Texas Business Corporation Act (TBCA) and the warrants were to be construed and governed by Texas law. The C-1 Stock Rights Documents contain, inter alia, a redemption provision requiring the Debtor to redeem the C-1 Stock under certain conditions. Specifically, the "Redemption" provision provided that:

> [a]t any time and from time to time after March 22, 2001, upon receipt of written demand from any holder of shares of Series C-1 Preferred Stock, the Corporation, to the extent it has legally available funds therefor, shall redeem the whole or any part of such holder's shares of Series C-1 Preferred Stock at a per share redemption price equal to $4.00 (the "C-1 Redemption Price").

SARAI, Art. 4.11(a), 10 R. 2029; Statement, ¶ 5(a), 9 R. 1695 (the "C-1 Stock Rights").[3] In order

---

[3] The Statement lists an identical "Redemption" provision, but adds the following words to the end, "provided that the Corporation shall have no redemption obligation with respect to the Series C-1 Preferred if it has closed an initial offering of securities to the public (an "IPO") on or before such date." Statement, ¶ 5(a), 9 R. 1695.

to exercise the C-1 Stock Rights, the stock certificate must be returned to the Debtor by mail not less than 30 days nor more than 60 days prior to the requested date of redemption (after 22 March 2001). See SARAI, Art. 4.11(e), 10 R. 2029-30; Statement, ¶ 5(b), 9 R. 1696. Each holder must also send a Redemption Notice to the Debtor stating the date on which such redemption is requested to take place, the number of shares to be redeemed, and the consideration payable with respect to such redemption, along with the C-1 Stock certificate "duly endorsed or assigned to the corporation or in blank." SARAI, Art. 4.11(e), 10 R. 2029-30; Statement, ¶ 5(b), 9 R. 1696. On 21 January 2000, the SARAI ranked the Carrieri Group's C-1 Stock as junior to other preferred stock in the event of liquidation, including that of the Kania Appellees. See SARAI, at Art. 3.1, 10 R. 2013.

In addition to the C-1 Stock, the Carrieri Group also received warrants[4] for the purchase of additional preferred stock of the Debtor as part of the merger. Each member of the Carrieri Group received warrants to acquire a specific number of shares of Series C-2 Preferred Stock ("C-2 Warrants") and Series C-3 Preferred Stock ("C-3 Warrants") (collectively, "Warrants")[5] at specified prices per share. Additionally, under the Warrant Rights Documents (which are separate from the C-1 Stock Rights Documents), the Debtor agreed to repurchase the Warrants at an agreed price if it had "legally available funds" at the time of the demand.[6] Specifically, the "Repurchase" provision,

---

[4] A "stock warrant", a type of security, is "an instrument granting the holder a long-term (usu. a five-to ten-year) option to buy shares at a fixed price" and is "commonly attached to preferred stocks or bonds." BLACK'S LAW DICTIONARY (8th ed. 2004) ("warrant"). In other words, a warrant is simply an "option to purchase shares of corporate stock at a fixed price." In re Daig Corp., 799 F.2d 1251, 1253 (8th Cir. 1986); Bradford v. Crown-Bremson Indus., Inc., 255 F. Supp. 1009, 1012 (M.D. Tenn. 1964). A stock warrant differs from a stock option only in the sense that options are granted to employees while warrants are sold to the public. See BLACK'S LAW DICTIONARY 1422 (5th ed. 1979).

[5] Though the Carrieri Group also received Series C-4 Preferred Stock Warrants, it did not appeal the bankruptcy court's decision disallowing its claim for them. The C-4 Warrants, thus, are not the subject of this appeal.

[6] The Carrieri Group was given four items from the merger that are relevant for this appeal and which may need clarification as to how they will be identified here: (1) the C-1 shares ("C-1 Stock"); (2) the rights to redeem the C-1 Stock, included in the Rights Documents, or "C-1 Stock Rights"; (3) the warrants to purchase additional preferred stock in C-2

4

which is identical for each Warrantholder, provides that:

> [a]t any time and from time to time after March 19, 2002, upon receipt of written demand from any Warrantholder of this Stock Warrant, the Company, to the extent it has legally available funds therefor, shall purchase the whole or any part of such Warrantholder's Stock Warrant at a purchase price equal to $6.00 per share of Series C-2 Preferred Stock for which this Stock Warrant is then exercisable, provided that the Company shall have no such purchase obligation with respect to the Stock Warrant if it has closed an IPO on or before such date.

Series C-2 Preferred Stock Warrant, ¶ 5, 10 R. 1705 (the "Warrant Rights"). To exercise the Warrant Rights, the Warrantholder must surrender the Warrant, a completed Exercise Agreement (attached to each Warrant), and pay the Debtor the Exercise Price. Id. ¶ 1, 10 R. 1703. The Warrant Rights were exercisable for five years from the date of execution, 22 March 1999, and expired on 22 March 2004. Id. ¶ 2, 10 R. 1704. The Warrants stated that they shall be construed in accordance with and governed by the laws of the State of Texas. Id. ¶ 14, 10 R. 1710. Although the Warrant Rights Documents does not specifically mention rankings or liquidation preferences, it states that in the event the Company makes a distribution to the C-2 Stock holders, the Warrantholders shall be entitled to a proportionate share of any such distribution as though the Warrantholder was the holder of Series C-2 Preferred Stock or Common Stock. Id. ¶ 6(c), 10 R. 1706. As with the C-1 Stock, the SARAI also ranked the Series E Preferred Stock, including that of the Kania Appellees, as senior to the Series C Preferred Stock and the Common Stock and to any other class or series of stock ranking with respect to any distributions or liquidation. See SARAI, at Art. 3.1, 10 R. 2013.

---

and C-3 shares ("Warrants"); and (4) the rights to demand repurchase of the Warrants, included in the Rights Documents, or "Warrant Rights". There is no question here that both the C-1 Stock and Warrants are "equity securities" under 11 U.S.C. § 101(16)(A) and (C). See Carrieri v. Jobs.com, Inc., 301 B.R. 187, 192-93 (N.D. Tex. 2003). The issue here is whether the C-1 Stock Rights and Warrant Rights are also "equity securities" under § 101(16)(C).

5

Each member of the Carrieri Group made a written demand for redemption of the C-1 Stock on or about 20 February 2001, requesting a redemption date of either 22 or 23 March 2001, and returned his stock certificate to Jobs.com. The Debtor rejected all these demands in writing as defective, stating that the Rights Documents set forth the requirements that must be satisfied before a C-1 Stock holder may exercise its redemption rights. None of the Carrieri Group members complied with the preliminary endorsement requirement when their first redemption demand was made and, therefore, the Debtor returned their redemption letters and C-1 Stock certificates.

The Debtor filed a voluntary Chapter 11 petition on 15 March 2001 ("Petition Date"). The Petition Date occurred just a few days before the specified redemption dates (22 or 23 March 2001). On 21 July 2001, each Carrieri Group member filed unsecured claims against the Debtor ("Carrieri Claims") in the bankruptcy proceeding in "unknown amounts" arising from the C-1 Stock, the Warrants, and the Rights Documents, prompting objections by Jobs.com. Through letters dated 19 March 2002, the Carrieri Group made (i) a demand on the Debtor for repurchase of the C-2 and C-3 Warrants; and (ii) a second redemption demand of the C-1 Stock. In response to the second redemption demand, the C-1 Stock certificates were again returned by the Debtor, even though they had been duly endorsed as required.

On 10 September 2002, after hearing evidence and testimony regarding the claims objection of the Debtor, the bankruptcy court disallowed the Carrieri Claims. See In re Jobs.com, Inc., 283 B.R. 209, 222 (Bankr. N.D. Tex. 2002). The bankruptcy court first determined that the C-1 Stock Right was an "equity security" under 11 U.S.C. § 101(16)(A) of the Bankruptcy Code. Interpreting § 101(16)(C), however, the bankruptcy court

6

suggested that the right to sell stock, such as the C-1 Stock Right, was excluded from the definition of "equity securities" by treating the listing "to purchase, sell, or subscribe to . . ." as a continuation of the "other than" restriction.

After applying TBCA Article 2.38, however, the bankruptcy court concluded that the Carrieri Claims for the C-1 Stock Rights were "claims" but unallowable under § 502(b)(1). Section 502(b)(1) states that a claim is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1) (1994). Because the Rights Documents required the Debtor to redeem the C-1 Stock only if the certificates were "duly endorsed or assigned" to the corporation and if the Debtor had "legally available funds", a phrase not defined by the Rights Documents or the TBCA, the bankruptcy court looked to the TBCA's definition for when such a corporate distribution may legally be made.

Under the TBCA, a "distribution may not be made if (1) after giving effect to the distribution, the corporation would be insolvent; or (2) the distribution exceeds the surplus of the corporation."[7] The bankruptcy court found that the Carrieri Group's stock redemption attempts failed for two reasons: (1) the Carrieri Group members initially failed to endorse or assign their C-1 Stock certificates as required; and (2) the Debtor did not have "legally available funds" with which to make the redemption because it would not have been able to pay its debts as they became due in the usual course of business (for both demands). The bankruptcy court based its decision on the credible testimony of Peter Gudmundsson ("Gudmundsson"), the Debtor's president, who testified that, at the time of the proposed

---

[7] TEX. BUS. CORP. ACT ANN. art. 2.38B (Vernon Supp. 2004).

$880,000 C-1 Stock redemption on 22 or 23 March 2001, Jobs.com had a projected negative cash flow of $524,857 for March 2001, and was projecting a $3,424,577 cumulative negative cash flow over the next six months, at which point it would run out of cash if it did not file for Chapter 11 protection. Gudmundsson testified that members of the board of directors believed that Jobs.com was in the "zone of insolvency" at the time of their 14 March 2001 meeting where they decided to file for bankruptcy the following day. Thus, the board believed that their fiduciary duties had expanded from just the equity holders to all of Jobs.com's stakeholders, including all creditors.

As for the Warrants, the bankruptcy court first noted that Warrants are "equity securities" under § 101(16)(C). See In re Jobs.com, Inc., 283 B.R. 209, 217 (Bankr. N.D. Tex. 2002). The bankruptcy court stated that, generally, the Warrant Rights would give rise to contingent and unmatured claims which are treated the same as the C-1 Stock Rights and, thus, would be "claims" that would be unenforceable under § 502(b)(1). See id. at 219. Following prior district court precedent, however, the bankruptcy court concluded that, "notwithstanding the mandatory repurchase obligation, the Warrants [and the Warrant Rights] remained equity interests in the Debtor *until* the repurchase obligation matured," at which time they would become "claims." Id. at 218, 221-22 (emphasis added) (citing Duel Glass v. Search Fin. Serve., Inc. (In re Search Fin. Serve. Acceptance Corp.), 2000 WL 256889, *3-4 (N.D. Tex. 2000) (holding that warrants containing a redemption feature, which did not mature until three years after the bankruptcy petition date, were properly characterized by the bankruptcy court and treated as equity interests in the debtor's plan)). Consistent with their contractual rights, however, the bankruptcy court determined that the Carrieri Group properly

8

demanded repurchase of the Warrants on 22 March 2002, giving them rights to payment or "claims", even though they were contingent and unmatured on the Petition Date. Similar to its interpretation for the C-1 Stock Rights, the bankruptcy court determined that this conclusion, that a right to sell a warrant, once matured, is not an equity security, is consistent with § 101(16)(C). The bankruptcy court, thus, similarly disallowed the Carrieri Claims for the Warrant Rights under § 502(b)(1) stating that the Debtor did not have "legally available funds" because it was or would have become insolvent after the distribution, even though it characterized them as "claims" or "debts" rather than "equity securities." The bankruptcy court, therefore, classified all the Carrieri Claims as "claims" but disallowed them in its 10 September 2002 order.

On 20 September 2002, the Carrieri Group filed a timely Rule 59(e) motion for new trial and/or reconsideration and a stay of the order pending a hearing, adding an argument under TBCA Article 2.38C. After a hearing, the bankruptcy court denied the Rule 59(e) motion on 7 November 2002, stating that the case law cited by the Carrieri Group as "newly discovered" was previo usly available at trial.[8] On 14 November 2002, the Carrieri Group timely filed its Notice of Appeal of the underlying order disallowing the Carrieri Claims.

On appeal, the district court ruled on 31 October 2003 that the Carrieri Claims for both the C-1 Stock Rights and Warrant Rights were "equity securities" rather than "claims" or "debts." See Carrieri v. Jobs.com, Inc., 301 B.R. 187, 193-94 (N.D. Tex. 2003). The district court stated that § 101(16)(C)'s "phrase, 'other than a right to convert' restricts the

---

[8] The case the Carrieri Group cited at the Rule 59(e) motion hearing was Parkway/Lamar Partners, L.P. v. Tom Thumb, Stores, Inc., 877 S.W.2d 848 (Tex. App. – Fort Worth 1994, writ denied), which we discuss later in this opinion. See infra Part III.C.2 & text after note 23.

9

word 'right,' but the definition then resumes with the words 'to purchase, sell, or subscribe to . . .' for a listing of the kinds of rights the definition covers." Id. at 193 (citation omitted). It held that the bankruptcy court had misread the definition of "equity security" to exclude the right to sell stock and to demand repurchase of warrants. See id. at 193-94. The district court, however, never reached the other four issues on appeal, including whether the Carrieri Claims should be analyzed under the Bankruptcy Code or Texas law and whether the Debtor had "legally available funds." By not explicitly overruling those issues or explaining why it chose not to discuss them, the district court impliedly affirmed the bankruptcy court's rulings. As discussed below, we find that affirming the bankruptcy court's rulings is necessary to support the district court's second ruling, that the Carrieri Group did not also hold "claims" independent of their equity interests. Because the Debtor's other equity holders, such as the Kania Appellees, had superior liquidation preferences to the Carrieri Group, the effect of the district court's ruling was that all allowed creditor claims were paid in full, and the surplus would go to the holders of stock with superior liquidation preferences. The Carrieri Group members would still receive no distribution under the district court's ruling, but for a different reason than under the bankruptcy court's ruling – due to their inferior liquidation preferences.

On 1 December 2003, the Carrieri Group timely filed a Notice of Appeal within thirty days of the entry of the district court's final judgment affirming the order of the bankruptcy court. See FED. R. APP. P. 4(a)(1)(A); FED. R. APP. P. 26(a)(3) (stating that if the last day of the thirty-day period is a Sunday, as was the case here, the following business day is used as the last day). This court has jurisdiction to hear this appeal under 28 U.S.C. § 158(d) and FED. R. APP. P. 6(b).

10

### III. DISCUSSION

This appeal mainly involves the proper interpretation of § 101(16)(C) of the Bankruptcy Code and whether the Carrieri Claims qualify as "equity securities" or "claims." The six issues to be determined on appeal are divided up here into two decisions by the district court and four by the bankruptcy court.

### A. Standard of Review

The Court of Appeals reviews the decision of a district court, sitting as an appellate court, by applying the same standards of review to the bankruptcy court's findings of fact and conclusions of law as applied by the district court. See United States Dep't of Educ. v. Gerhardt (In re Gerhardt), 348 F.3d 89, 91 (5th Cir. 2003); Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.), 258 F.3d 385, 387 (5th Cir. 2001). Generally, a bankruptcy court's findings of fact are reviewed for clear error while conclusions of law are reviewed de novo. See Williams v. Int'l Bhd. of Elec. Workers, Local 520 (In re Williams), 337 F.3d 504, 508 (5th Cir. 2003). Under the clearly erroneous standard, this court will reverse "only if, on the entire evidence, we are left with the definite and firm conviction that a mistake has been made." Walker v. Cadle Co. (In re Walker), 51 F.3d 562, 565 (5th Cir. 1995). With regard to the bankruptcy court's finding of no "legally available funds", however, when a finding of fact is premised on an improper legal standard, or a proper standard improperly applied, that finding is reviewed de novo. See In re Missionary Baptist Found. of Am., Inc., 712 F.2d 206, 209 (5th Cir. 1983).

### B. The District Court Rulings

11

The following two issues are key and, thus, require more explanation and analysis.

1.       **The Carrieri Claims Are "Equity Securities" Under § 101(16)(C)**

The Carrieri Group contends that the district court erred in affirming the bankruptcy court's decision to sustain the Debtor's objection to the Carrieri Group's proofs of claim when it found, contrary to the bankruptcy court, that the Carrieri Claims were "equity securities."[9] Contending that the bankruptcy court correctly characterized the Carrieri Claims as "rights to sell stock", which were excluded from being "equity securities" under § 101(16)(C), the Carrieri Group asserts that its claims are not "equity securities." While it believes that the bankruptcy court's interpretation is correct, the Carrieri Group argues that we need not make such a determination because it contends in its second issue on appeal that the district court was also incorrect in holding that "equity security" and "claim" are mutually exclusive in this case.

The Carrieri Group's arguments are unpersuasive for three reasons: (1) the district court's correct interpretation of § 101(16)(C); (2) the legislative history shows that Congress intended the C-1 Stock Rights and Warrant Rights to be "equity securities"; and (3) the purpose of Chapter 11 of the Bankruptcy Code under the "absolute priority rule" supports the finding that the Carrieri Claims are "equity securities."

First, the district court properly ruled that the bankruptcy court had misread § 101(16)(C) to exclude the right to sell stock and to demand repurchase of warrants. The

---

[9] Section 101(16) provides that "equity security" means:
      (A) share in a corporation, whether or not transferable or denominated "stock", or similar security;
      (B) interest of a limited partner in a limited partnership; or
      (C) warrant or right, other than a right to convert, to purchase, sell, or subscribe to a share, security, or interest of a kind specified in subparagraph (A) or (B) of this paragraph;
11 U.S.C. § 101(16) (2000).

12

bankruptcy court concluded that the Carrieri Group's C-1 Stock Rights did not constitute

"equity securities" because it interpreted § 101(16)(C) to exclude the right to sell stock by

treating the list of words after "other than a right to convert" as a continuation of the

exclusion.[10]  The district court's interpretation of § 101(16)(C), however, is the correct

one, both under the "plain meaning" rule, as reinforced by the Supreme Court in Lamie,

and under the legislative history.  See Lamie v. United States Trustee, 540 U.S. 526, 124

S. Ct. 1023, 1030-31 (2004).  It is well established that, "when the statute's language is

plain, the sole function of the courts – at least where the disposition required by the text is

not absurd – is to enforce it according to its terms."  Id. at 1030.  Only after application of

the principles of statutory construction, including the canons of construction,[11] and after a

---

[10] Essentially, the bankruptcy court's interpretation rewrites § 101(16)(C) to be:
>    (C) warrant or right, other than a right to:
>       (1) convert,
>       (2) purchase,
>       (3) sell, or
>       (4) subscribe to
>             (a) a share,
>             (b) a security, or
>             (c) an interest of a kind specified in subparagraph (A) or (B) of this paragraph;

[11] Both the bankruptcy and district courts' interpretation of § 101(16)(C) could arguably follow the applicable canons of construction.  One canon of construction, *ejusdem generis*, arguably supports the bankruptcy court's interpretation.  *Ejusdem generis* states that the general language of a statute is limited by the specific words and phrases that precede the general language.  See, e.g., First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In Re Biloxi Casino Belle Inc.), 368 F.3d 491, 500 n.8 (5th Cir. 2004) ("Under the doctrine of '*ejusdem generis*,' where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated.") (emphasis added); see also ABNER J. MIKVA & ERIC LANE, AN INTRODUCTION TO STATUTORY INTERPRETATION AND THE LEGISLATIVE PROCESS 24 (1997).  Although not the typical case for *ejusdem generis*, the general language of § 101(16)(C) of "convert, to purchase, sell, or subscribe . . . " could arguably be limited by the specific phrase of "other than a right to," which precedes the listing, making the listing merely a continuation of the terms that are excluded.
        On the other hand, other applicable canons of construction support the district court's interpretation.  A couple of canons of construction state that a statute should be construed such that none of its terms are redundant and should be read to avoid internal inconsistency.  See, e.g., Crist v. Crist (In re Crist), 632 F.2d 1226, 1233 n.11 (5th Cir. 1980) (stating that courts should give effect, whenever possible, "to all parts of a statute and avoid an interpretation which makes a part redundant or superfluous."); see also MIKVA & LANE, at 24.  Reading § 101(16)(C) as the bankruptcy court did may make Sections 101(16)(A) and (B) either redundant or internally inconsistent with (C).  If "equity security" excludes, as the bankruptcy court interpreted, a right to purchase, sell, or subscribe to a "share" or "interest" as specified in (A) ("share in a

13

conclusion that the statute is ambiguous may the court turn to the legislative history. See

United States v. Kay, 359 F.3d 738, 743 (5th Cir. 2004). For the language to be

considered ambiguous, however, it must be "susceptible to more than one reasonable

interpretation" or "more than one accepted meaning." Id. The district court's reading of

§ 101(16)(C) is the more logical one based on the "plain meaning" rule and the canons of

construction. The phrase "other than a right to convert" restricts only the word "right"

and not the rest of the section. See In re Am. W. Airlines, 179 B.R. 893, 897 (Bankr. D.

Ariz. 1995) (holding that "only a right to convert is not included in the definition of

'equity security'", but a right to purchase, however, is within § 101(16)(C)); see also In re

Allen, 226 B.R. 857, 865 (Bankr. N.D. Ill. 1998) (stating that § 101(16) defines "equity

security" as a "share in a corporation" and includes the right to purchase shares within the

definition); In re E. Me. Elec. Co-op, 121 B.R. 917, 928 (Bankr. D. Me. 1990) (stating

---

corporation, whether or not transferable or denominated 'stock', or similar security") or (B) ("interest of a limited partner in a limited partnership"), it is difficult to imagine what other rights could remain (except, perhaps, a right to transfer or assign, which, as a matter of fact, happens to be included as a combined option on the back of these stock certificates to "sell, assign and transfer"). "Equity security" under the bankruptcy court's interpretation of § 101(16)(C) would, thus, inexplicably mean a right in a share of a corporation or an interest in a limited partnership that does *not* include the right to purchase, sell, or subscribe that share or interest and would only include the right to transfer or assign it. This interpretation narrows the universe of "equity security" rights under § 101(16)(C) to only include a right to transfer or assign a warrant.

　　Furthermore, using the bankruptcy court's interpretation, the first part of § 101(16)(C), "warrant", would become inconsistent with the second part, the exclusion of the right to purchase a share in a corporation. As defined above, a "warrant" is a type of "security" under § 101(49)(A)(xv) and simply is an option to purchase stock at a given price. See supra n.4. If "equity security" includes a "warrant", but not a right to sell a security or to purchase a share in a corporation under the bankruptcy court's interpretation, § 101(16)(C) would be wholly inconsistent. First, it is hard to imagine that Congress had intended "warrant" in one provision of Section 101, § 101(16)(C), to mean something different from "warrant" in another provision of Section 101, § 101(49)(A)(xv), where "security" includes a "warrant." See Cohen v. de la Cruz, 523 U.S. 213, 220 (1998) (stating that there is a presumption in the Bankruptcy Code that "equivalent words have equivalent meaning when repeated in the same statute. . . ."). The historical and statutory notes for § 101(49)(A) prove otherwise. Every term that is defined as an "equity security" under § 101(16) is also a "security" under § 101(49)(A) (previously § 101(35)), and the definition of "security" is deliberately open-ended because it is not "susceptible of precise specification" and courts will be able to treat new kinds of documents on a "flexible basis." 11 U.S.C. § 101, Historical and Statutory Notes, Revision Notes and Legislative Reports (1978). Second, it is also hard to imagine that Congress intended "equity security" to include a "warrant", which is an option to purchase stock at a given price, but excluded the right to purchase a share in a corporation, which is substantially similar.

14

that the definition of "equity security" includes "warrants or *rights to purchase, sell or*

*subscribe . . .*") (emphasis added); COLLIER ON BANKRUPTCY ¶ 101.16 (15th ed. 1993).

A proper statutory construction, and a clearer way to read § 101(16)(C), would be

to place the words "other than a right to convert" in parentheses, in italics (as the Debtor

suggests),[12] or at the end of the provision. Thus, § 101(16)(C) should be read as follows:

> (16) "equity security" means –
>> . . .
>> (C) warrant or right (other than a right to convert) to purchase, sell,
>> or subscribe to a share, security, or interest of a kind specified in
>> subparagraph (A) or (B) of this paragraph;

Second, even assuming arguendo that § 101(16)(C) is ambiguous, looking briefly

at the legislative history makes it clear that the district court's interpretation is the correct

one. Congress did not intend the definition of "equity security" to include "a security,

such as a convertible debenture, that is convertible into equity security, but has not been

converted." S. REP. NO. 95-989, at 24, 95th Cong., 2d Sess. (1978), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5810; H.R. REP. NO. 95-595, at 311, 95th Cong., 1st Sess. (1978),

*reprinted in* 1978 U.S.C.C.A.N. 5963, 6268.[13] It follows then that Congress did not

intend to exclude anything else from the definition of "equity security", such as the right to

sell/redeem stock or to demand repurchase of warrants, because it did not explicitly list

---

[12] A bankruptcy court outside of this circuit has also placed those words in italics for emphasis. See In re Standard Oil & Exploration of Del., Inc., 136 B.R. 141, 150 (Bankr. W.D. Mich. 1992) (stating that § 101(16)(C) should be read, "(C) warrant or right, *other than a right to convert*, to purchase, sell, or subscribe . . ." according to the legislative history) (alteration in original) (citation omitted).

[13] A noted bankruptcy professor has also pointed out that Congress intended "equity security" under § 101(16)(C) to include warrants or other rights to purchase, sell, or subscribe to securities. See ALAN N. RESNICK, BANKRUPTCY LAW MANUAL § 6:3 (5th ed. 2003) (stating that "[e]quity security holders, including those persons who hold shares of stock in a debtor corporation, . . . or warrants *or other rights to purchase, sell, or subscribe to such securities*, may also wish to participate in the case.") (emphasis added).

15

any other restricted terms. The district court's interpretation of § 101(16)(C), therefore, is the correct one based on the legislative history. This interpretation adheres more closely to the plain language of § 101(16)(C) by more accurately respecting the words of Congress. See Lamie v. United States Trustee, 540 U.S. 526, 124 S. Ct. 1023, 1031-32 (2004).

Accepting the district court's interpretation also requires less alteration of § 101(16)(C) than does the bankruptcy court's construction and does not lead to an absurd result as it is in accord with common bankruptcy practice. See id. We therefore reject the bankruptcy court's interpretation and accept the district court's reading of § 101(16)(C). Consequently, the Carrieri Group's right to redeem its C-1 Stock was an "equity security" because it is a right to sell a "security" or a "share in a corporation." 11 U.S.C. §§ 101(16)(A) & (C) (2000). The district court's ruling that the C-1 Stock Rights were "equity securities" and not "claims" is affirmed.

Similarly, the district court's ruling that the Warrant Rights are "equity securities" is also affirmed. The Code defines "equity security" to expressly include the Warrants. 11 U.S.C. § 101(16)(C) (2000). Each of the Warrants contained a repurchase provision whereby the holder may demand repurchase of the warrant for $6.00 per share of C-2 or C-3 Preferred Stock "[a]t any time and from time to time after March 19, 2002" for the C-2 and C-3 Warrants. 10 R. 1705, 1807. The bankruptcy court had determined that, consistent with its erroneous interpretation of "equity security", the Warrant Rights matured as "claims" after the demand for repurchase was made by letters dated 22 March 2002, and subsequently disallowed them as "claims" under § 502(b)(1).

16

The district court ruled that, because the bankruptcy court's interpretation of "equity security" was incorrect for the C-1 Stock Rights, it was also incorrect as to the Warrant Rights. The right to demand repurchase of the Warrants falls within the definition of "equity security" under § 101(16)(C) because stock warrants are simply options to purchase stock at a given price. See In re Daig Corp., 799 F.2d 1251, 1253 (8th Cir. 1986). A "warrant" is a "security" under § 101(49)(A)(xv) and "equity security" includes a warrant or right to purchase or sell a security. See 11 U.S.C. § 101(16)(C) (2000); see also Duel Glass v. Search Fin. Servs. (In re Search Fin. Servs. Acceptance Corp.), 2000 WL 256889, at *3 (N.D. Tex. 2000) (holding that warrants containing a redemption feature that did not mature before the bankruptcy petition were properly characterized as equity interests). Section 101(16)(C), thus, would include a right to sell a warrant, as the Warrant Rights Documents allow for their repurchase upon demand. We therefore also affirm the district court's ruling that the Warrant Rights are "equity securities" under § 101(16)(C).

Finally, in the alternative, the Debtor properly points out that the "absolute priority rule" requires us to affirm the district court's decision that the Carrieri Claims are "equity securities." Although "interest" is not defined in the Code, it is universally understood to mean an equity interest in the debtor. See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 437 (1999) (holding that "old equity holders are disqualified from participating in such a 'new value' transaction by the terms of 11 U.S.C. § 1129(b)(2)(B)(ii), which in such circumstances bars a junior interest holder's receipt of any property on account of his prior interest."); Citicorp Real Estate v. PWA, Inc. (In re

17

Georgetown Bldg. Assocs.), 240 B.R. 124, 138 (Bankr. D.D.C. 1999). One of the main

purposes of Chapter 11 of the Code is demonstrated by the "absolute priority rule" under

§ 1129(b)(2)(B)(ii) that creditors' rights and claims take priority over equity interests.

See 11 U.S.C. §§ 1129(a)(7) & 1129(b)(2)(B)(ii) (1994) (stating that claims are entitled

to priority over equity security interests). Although the "absolute priority rule" is

generally only used by the bankruptcy court when determining whether to confirm a

Chapter 11 plan, the overarching theory behind it supports affirming the decisions to

sustain the objections to the Carrieri Claims. The "absolute priority rule" provides that a

"dissenting class of unsecured creditors must be provided for in full before any junior class

can receive or retain any property [under a reorganization plan]" and there is "little doubt

that a reorganization plan in which [a junior class] retain[s] an equity interest" is contrary

to this rule. Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202-03 (1988);

Georgetown Bldg., 240 B.R. at 138.

Warrants with redemption provisions, such as those of the Carrieri Group, are

equity interests until their expiration (or until the right to receive a cash payment properly

matures on or before the petition date). See Duel Glass v. Search Fin. Servs. (In re

Search Fin. Servs. Acceptance Corp.), 2000 WL 256889, at *3 (N.D. Tex. 2000). Here,

assuming that the Search court is correct,[14] the Carrieri Group's Warrant Rights did not

---

[14] The bankruptcy court followed Search with reservations to form its holding, see In re Jobs.com, Inc., 283 B.R. 209, 217-20 (Bankr. N.D. Tex. 2002), whereas the district court only string-cited Search as one of a couple of cases that discussed the possibility that an equity interest may convert into a claim at some time. See Carrieri v. Jobs.com, Inc., 301 B.R. 187, 194 (N.D. Tex. 2003). The Search case appears to be the only district court-level case in this circuit directly on point, though there is another district court decision that is persuasive on the issue of whether a stock redemption claim is equity or debt. See S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373, 388-89 (E.D. Tex. 2000) (holding that patronage stock redemption claims should be treated as equity interests, because they are not payable on demand like debt but rather are subject to a variety of limitations and wholly contingent upon the cooperative's profitability

18

expire until 22 March 2004, well after the 15 March 2001 Petition Date and, thus, were properly characterized as "equity securities." Furthermore, the rights of shareholders to redeem stock are equity interests because they are not guaranteed the right to payment, as claims are, but rather are dependent on the solvency of the corporation. See In re Revco D.S., Inc., 118 B.R. 468, 474 (Bankr. N.D. Ohio 1990) (holding that the mandatory redemption provision of convertible preferred stock is an equity interest and not a claim); In re Joshua Slocum, Ltd., 103 B.R. 610, 623 (Bankr. E.D. Pa. 1989) (stating that the rights of shareholders to recover dividends or to redeem stock is dependent on the financial solvency of the corporation). It is clear from the district court's decision, and the Rights Documents, that the Carrieri Claims were "equity securities" under § 101(16)(C), not "claims" as the bankruptcy court held. As "equity securities", the Carrieri Claims were subject to the "absolute priority rule" at confirmation which requires that creditors with unsecured claims (and senior preferred equity holders such as the Kania Appellees) be paid in full before any equity interests are paid. Even if the Debtor ended up with a surplus and paid off all its creditors and other equity holders, the Carrieri Group's argument on this point benefits from 20-20 hindsight. This fact does not change the tenuous situation the Debtor was in at the time it refused the Carrieri Claims or at the time the bankruptcy court sustained the objection to them.[15] Moreover, the Carrieri Claims

---

and, thus, are subordinate to unsecured debt at confirmation). To the extent that the Search court's holding, that warrants with redemption provisions are properly treated as equity interests until they expire (or until the right to receive a cash payment properly matures on or before the petition date), applies here, we agree with that conclusion. See Search, 2000 WL 256889, at *3.

[15] After the claims objection hearing on 1 July 2002, and closing arguments on 6 August 2002, the bankruptcy court requested an updated cash on hand and claim amount status from the Debtor. On 7 August 2002, the Debtor submitted a post-hearing letter updating Jobs.com's cash on hand at the time to be $6,059,000 and all unpaid claims as

were properly terminated under the Debtor's plan upon confirmation,[16] thus making the

Carrieri Group ineligible to receive any distribution whatsoever, as long as it was deemed

to hold only "equity securities" and not "claims" as it properly was here. We affirm the

district court's judgment, therefore, that the Carrieri Claims were "equity securities" under

§ 101(16)(C).

### 2. The Carrieri Claims Could Not Also Be "Claims" Under § 101(5)

The Carrieri Group argues that the district court erred by finding, contrary to the

bankruptcy court, that the Carrieri Claims could not also be "claims" under 11 U.S.C. §

101(5). Contending that the district court's finding that "equity securities" and "claims"

are mutually exclusive is flawed, the Carrieri Group asserts that even if the Carrieri Claims

are "equity securities" under the Code, the Carrieri Group can also hold claims

independent of its equity interests. The Carrieri Group contends that, because of the

---

follows: (1) unpaid administrative claims – $80,000; (2) estimated interest on allowed unsecured claims through 1 September 2002 – $150,000; (3) allowed unsecured claims – $3,100,000; (4) College Club claim – $537,000; (5) Series C-C-1 claims – $880,000; and (6) Series C-C-2 and C-3 claims – $1,320,000. 6 R. 854. If the Debtor paid claims (1)-(5), including redeeming the C-1 Stock, it would still have had $1,312,000, but it would have had a negative $8,000 balance if it also paid off claim (6), which included repurchasing the Warrants. Paying the Carrieri Claims in March 2001, while the check would technically have cleared the bank, would have hastened the Debtor's inability to operate and would have "jeopardized its most valuable asset, the advertising agreement with CBS, which required that the Debtor keep its website operating at least 97% of the time. . . ." In re Jobs.com, Inc., 283 B.R. 209, 216 (Bankr. N.D. Tex. 2002). By choosing not to pay the Carrieri Claims, the Debtor's board had just enough funds to keep the website operating at a minimal level, in order to comply with contractual guidelines, and provided leverage in its adversary proceeding against CBS. That the Debtor eventually ended up paying off all other creditors and senior equity holders was the result of, inter alia, the case settling in February 2002 after CBS decided to buy the ad contract back for about $4.4 million in cash and debt forgiveness. Id. at 217.

[16] Section 1141, "Effect of confirmation", states that, "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan – . . . (B) terminates all rights and interests of equity security holders . . . provided for by the plan." 11 U.S.C. § 1141(d)(1)(B) (1984). In other words, the Debtor's plan mostly followed § 1141 by terminating all equity interests, but first granted the Kania Appellees a distribution before termination, after paying all senior classes in full, while the Carrieri Group was not given any distribution. The Carrieri Group objected to the plan, but the bankruptcy court confirmed the plan over all objections on 27 June 2002. The objection was "designed to protect its members' right to participate as creditors under the plan if they held allowable, non-subordinated claims against the Debtor." 6 R. Excerpt 45. At confirmation, the parties agreed that if the Carrieri Claims were allowed, and not subordinated, they would be Class 3 claims, ahead of the Kania Appellees. Id. at n.7.

20

intentionally broad definition of "claim", see In re Andrews, 239 F.3d 708, 710 (5th Cir. 2001), many courts have recognized that an equity holder is not mutually exclusive with that of a claim holder. See In re St. Charles Pres. Investors, 112 B.R. 469, 475 (D.D.C. 1990) (holding that a partnership agreement gave an equity interest and a right to guaranteed repayment of purchase price such that the partner held both equity interest and claim); IDS Holding Co. v. Madsen (In re IDS Holding Co.), 292 B.R. 233, 238 (Bankr. D. Conn. 2003) (holding that a distribution agreement provided shareholder with a claim against the company in addition to being equity security holder); In re Baldwin-United Corp., 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (holding that the corporation granted option holders a "guaranteed" right to a future cash payment in exchange for forbearance from exercising their stock options prior to the acquisition of another company). In Baldwin, the court held that the cash surrender rights under the stock option plan were general unsecured claims because they were guaranteed payments under the Employee's Stock Option Plan (ESOP) whereas the stock acquisition rights of the same ESOP were treated as equity securities. See Baldwin, 52 B.R. at 552. The Baldwin court's analysis, asserts the Carrieri Group, should apply here because it was allegedly guaranteed cash if it redeemed its stock and sold its warrants.

The Carrieri Group's argument that they also hold "claims" independent of its "equity interests" lacks merit, and we affirm the district court's judgment for the following reasons: (1) the language in the Rights Documents plainly does not provide the Carrieri Group with an independent and enforceable "right to payment" as required to be a "claim" under § 101(5)(A); and (2) even if the Carrieri Claims could be construed as "claims",

21

they were subject to mandatory subordination under Sections 510(a) or (b) and were properly disallowed.

First, a "claim" includes the "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A) (2000). The touchstone of any "claim" is that there is an "enforceable obligation" of the debtor or an enforceable "right to payment" from the debtor. Johnson v. Home State Bank, 501 U.S. 78, 83 (1991) (stating that "'right to payment' [means] . . . an enforceable obligation. . . ."); In re Andrews, 239 F.3d 708, 710 (5th Cir. 2001) (stating that a "claim" is an enforceable right to payment which, in that case, had been reduced to a judgment); In re Einstein/Noah Bagel Corp., 257 B.R. 499, 506-07 (Bankr. D. Ariz. 2000). Due to the lack of case law on point from either the Supreme Court or the Fifth Circuit, we find that, as the bankruptcy court did, the reasoning of Einstein is persuasive in this case, even though it is a bankruptcy-level decision from another circuit.

In Einstein, Bagel Funding, an equity security holder of the Chapter 11 debtor (Bagel Partners), had a "Put Right" giving it the right to require that its equity interest be purchased by the debtor in cash or stock at the *debtor's* option. See Einstein, 257 B.R. at 501-02. It was clear to the Einstein court that the "Put Right" was intended to be a liquidity device, providing Bagel Funding a way to liquidate an otherwise illiquid investment, but clearly did not include a "right to payment" as required by § 101(5). See id. at 506. The "Put Right" only gave Bagel Funding a right to *sell* its interest at a specified price with the payment in cash or stock decided by the debtor, making this set of

22

rights an "equity security" under § 101(16)(C). See id. Furthermore, even if the "Put Right" could be construed to contain an obligatory cash payment, the Einstein court held that this would not change it from an equity security to a claim. See id. On the petition date, the right to receive the cash or stock would not have matured because the "Put Right" itself had not become exercisable. See id.

In this case, the language in the Rights Documents plainly does not include an independent "right to payment." The Rights Documents contained a redemption provision that required the Debtor to redeem the C-1 Stock "to the extent it has legally available funds." The Debtor was also required to repurchase the Warrants at an agreed price if it had "legally available funds." Both of these phrases were negotiated for by the Debtor for a reason. It is telling that this phrase is not found in the SARAI provisions describing the Series A, B, and E stock because those equity holders bargained for a priority upon liquidation. The C-1 Stock Rights and Warrant Rights, therefore, did not grant the Carrieri Group a "right to payment", as required under § 101(5)(A). The Carrieri Group members were granted redemption rights and rights to demand repurchase, similar to the "Put Right" in Einstein, and were not given "rights to payment", enforceable or otherwise. The Rights Documents plainly conditioned these rights on the Debtor having "legally available funds." Although there is support for the Carrieri Group's theory that "equity securities" are not mutually exclusive from "claims", we need not definitively decide that issue as it does not specifically arise here. Even if one document can give rise to independent equity interests and claim rights, which we believe is possible if the payment obligation is guaranteed at specified intervals or at a specific time or event and is separate

23

and distinct from the equity interests, the Rights Documents in this case plainly did not do so.[17]

Furthermore, courts are clear that stock options, or the rights to exercise the stock option, are properly classified as equity security interests, not claims. See In re Baldwin-United Corp., 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (holding that a claim to exercise a stock option, as opposed to the cash option right, was an equity security); In re Am. W. Airlines, 179 B.R. 893, 897 (Bankr. D. Ariz. 1995) (holding that stock options for the purchase of common stock of the debtor are equity securities); In re Allen, 226 B.R. 857, 865 (Bankr. N.D. Ill. 1998) (stating that stock options, as rights to purchase securities, are securities under the Bankruptcy Code). The Warrant Rights allow for the right to demand repurchase or to sell stock and, thus, are similar to stock options and were properly classified as "equity securities" by the district court. Although "claim" is a right to payment and "debt" is a liability on a claim, see 11 U.S.C. §§ 101(5)(A) & 101(12), these definitions "obviously do not include a right to payment based on an equity security or other interest in the debtor arising from capital contributions." Citicorp Real Estate v. PWA, Inc. (In re Georgetown Bldg. Assocs.), 240 B.R. 124, 139 (Bankr. D.D.C. 1999). Just because "the interest in the debtor gives rise to a right to payment does not make that interest a claim." Id. In this case, the Rights Documents did not give rise to rights to payment, but even if they did, that does not automatically transform the equity interests

---

[17] See In re St. Charles Pres. Investors, Ltd., 112 B.R. 469, 473-74 (D.D.C. 1990); In re Sid Bernstein, Ltd., 1996 WL 183375, *7 (Bankr. E.D. Pa. 1996) (stating that the definition of a "claim" is limited to a "right to payment" which is established by demonstrating "a legal entitlement to payments of money from the debtor at specified intervals [or at a specified time or event].").

24

into "claims." The district court's ruling that the C-1 Stock Rights and Warrant Rights are "equity securities" and not also "claims", therefore, is affirmed because the Rights Documents do not give rise to independent rights to payment, enforceable, guaranteed, or otherwise.

Moreover, three of the cases that the Carrieri Group cites for the proposition that equity securities are not mutually exclusive with claims are easily distinguishable from this case because they either rely on different language in the rights documents or on different state law. The St. Charles case dealt with a partnership agreement that stated that the partnership shall pay to the partners a "guaranteed payment of interest" on a monthly basis. See In re St. Charles Pres. Investors, Ltd., 112 B.R. 469, 473-74 (D.D.C. 1990) (holding that the "appellants' entitlement to guaranteed payment obligations are *in addition to and separate from* their equity interests."). In Baldwin, also cited by the Carrieri Group, option holders were granted "guaranteed" cash surrender rights to future cash payments in exchange for forbearance from exercising their stock options. See In re Baldwin-United Corp., 52 B.R. 549, 552 (Bankr. S.D. Ohio 1985) (holding that the rights to exercise the stock options were "equity securities" whereas the separate cash surrender rights were unsecured claims because the corporation granted them a "guaranteed right to a cash payment in the future.").

Here, in contrast to St. Charles and Baldwin, there is no "guaranteed" right to payment language, at specified intervals or otherwise, in the Rights Documents for either the C-1 Stock or the Warrants. See In re Revco D.S., Inc., 118 B.R. 468, 474 (Bankr. N.D. Ohio 1990) (holding that St. Charles was inapplicable to the instant case because

25

"mandatory redeemable preferred stock lacks the feature of the guaranteed interest payments which were the basis of the court's ruling in St. Charles."). The Rights Documents also do not create "separate and distinct interests which are independent of each other" such as the guaranteed monthly interest payments and profit sharing that were expressly provided for in the St. Charles partnership agreement or the separate guaranteed cash surrender rights and stock options in the Baldwin ESOP. St. Charles, 112 B.R. at 474; Baldwin, 52 B.R. at 550. The IDS court, on the other hand, based its holding on Connecticut law that the equity security holder was also a claim holder. See In re IDS Holding, Inc., 292 B.R. 233, 238 (Bankr. D. Conn. 2003) (holding that, upon execution of the distribution agreement entitling the equity holder to a distribution, the equity holder had the same status as a creditor of the limited liability company (LLC) with respect to the distribution under the Connecticut LLC statute). In this case, the applicable state law (the TBCA) does not provide for such equal treatment of equity holders as creditors.[18] Even if it did, as discussed below, the Carrieri Group was not entitled to receive distributions of the C-1 Stock or the Warrants at the time of its demands because its rights would not become exercisable until a later date. We affirm the district court's ruling, therefore, that the Carrieri Claims were "equity securities" and could not also be "claims."

Second, even assuming arguendo that the Carrieri Claims could also be construed as "claims" under § 101(5)(A), the bankruptcy court properly disallowed them because

---

[18] The only provision that may arguably apply here is TBCA Article 2.38E, which the Carrieri Group points out below as support for one of its "surplus" arguments. As discussed below, the bankruptcy court's ruling that there were no "legally available funds" because the Debtor would have exceeded its "surplus" is consistent with Article 2.38E. See infra Part II.C.3 & text accompanying note 31.

they would be subject to subordination under either Sections 510(a) or (b), but not 510(c) equitable subordination as the Debtor contended,[19] and because, at the time of the C-1 Stock and Warrant demands, these "claims" were not exercisable. Although the bankruptcy court only mentioned that the Carrieri Claims would be subordinated under § 510(b) to the unsecured creditors and higher priority equity holders, as further discussed below, § 510(a) also may provide support for the district court's ruling.

Section 510(a) states that a "subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." At the time of the merger, the Carrieri Group contractually agreed to subordinate its equity interests to those of the Kania Appellees and other preferred equity holders in the event of liquidation. 11 R. 2265; Kania Appellees' Br., at 14. This subordination agreement would be enforceable outside of bankruptcy and, thus, would also be enforceable in bankruptcy. The Carrieri Group, therefore, cannot take post-petition steps to try to alter its subordination agreement and change its equity interests into debt in contravention of Section 510(a).

Under § 502(b), the rights of holders of claims and interests are fixed as of the

---

[19] Bankruptcy courts have equitable powers to adjust the rights between creditors under § 510(c). See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 24 (2000). Section 510(c) states that a court, after notice and a hearing, may, "under principles of equitable subordination, subordinate for purposes of distribution . . . all or part of an allowed interest to all or part of another allowed interest." Equitable subordination, however, is remedial in nature and is rarely granted unless three conditions are satisfied: (1) when the claimant engaged in inequitable conduct; (2) the conduct resulted in harm to the creditors or conferred an unfair advantage upon the claimant; and (3) equitable subordination is not inconsistent with the Bankruptcy Code. See In re Cajun Elec. Power Co-op., Inc., 119 F.3d 349, 357 (5th Cir. 1997).

In this case, because the bankruptcy court only discussed § 510(b) subordination, a hearing would be required in order to determine whether to apply the principles of equitable subordination as the Debtor suggested. None of the prerequisites for equitable subordination, however, are present here to warrant such a remand, particularly because there is no evidence of inequitable conduct on the part of the Carrieri Group and all the creditors have been paid in full. It appears from the record that neither the Debtor nor the Kania Appellees even argued for equitable subordination under § 510(c) below, which may mean that they waived this argument on appeal.

27

Petition Date. When the new Jobs.com was formed, the Carrieri Group contractually agreed to exchange its equity interests in the old Jobs.com for equity interests in the new Jobs.com. The Carrieri Group's interests in the Debtor, thus, would be determined as of 15 March 2001, the Petition Date. Even though the Carrieri Group attempted to exercise its redemption rights in the C-1 Stock on 20 February 2001 (per the Rights Documents, there was a short time period before 22 March 2001 when it could file its redemption demand), its redemption right did not ripen until after 22 March 2001, and its right to demand repurchase of the Warrants did not ripen until after 19 March 2002. The fact that it did not endorse the stock certificates, as required by the Rights Documents and discussed further below, is yet another reason that the Carrieri Group had not exercised its rights in the C-1 Stock as of the Petition Date. The Carrieri Group's rights in the C-1 Stock and Warrants, therefore, were unexercised and not ripe for exercise as of the Petition Date and properly classified as "equity securities." Also, with respect to the second tender of the C-1 Stock and the demand for repurchase of the Warrants, the Carrieri Group improperly attempted to take a post-petition step to change the nature of its pre-petition equity interests, to the detriment of other creditors, by trying to "leapfrog" over three groups of equity holders to which it had agreed to be subordinated, namely, the Kania Appellees and the Series A and B preferred stockholders. As "equity securities", the C-1 Stock Rights and Warrant Rights were properly subject to cancellation upon plan confirmation, as the Debtor's confirmed plan provided. See 11 U.S.C. § 1141(d)(1)(B) (1984). We affirm the district court's decision, therefore, that the Carrieri Claims are "equity securities" and not "claims" in light of § 510(a) subordination because the Carrieri

28

Group contractually agreed to subordinate its equity interests.

Furthermore, even if the Carrieri Claims could be construed as "claims" under § 101(5)(A), § 510(b) provides more support for the bankruptcy court's ruling to disallow the Carrieri Claims. Section 510(b) states that, for purposes of distribution, "a claim arising from rescission of a purchase or sale of a security of the debtor . . . or for reimbursement . . . allowed under § 502 . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security. . . ." 11 U.S.C. § 510(b) (1984). The bankruptcy court determined that § 510(b) provided unsecured creditors with another type of protection from claims which arise from equity securities because they must be subordinated to all senior or equal claims. Had the Carrieri Claims actually been deemed to be "claims" or to include independent "claims" by the bankruptcy court, because they arose from the "sale of a security of the debtor", they nevertheless would have been subordinated to all senior or equal unsecured claims and preferred equity holders, such as the Kania Appellees. While the district court's decision did not specifically address subordination, it did cite case law that reiterates the above notion that equity security holders are junior to claims and are not entitled to participate as meaningfully in a bankruptcy case as do claim holders. See Citicorp Real Estate, Inc. v. PWA, Inc. (In re Georgetown Bldg. Assocs. Ltd. P'ship), 240 B.R. 124, 138-39 (Bankr. D.D.C. 1999); In re Joshua Slocum, Ltd., 103 B.R. 610, 623 (Bankr. E.D. Pa. 1989) (holding that redemption rights of preferred stockholders are properly characterized as security interests and not claims). As discussed above, the Carrieri Claims in the C-1 Stock and Warrants were properly characterized by the district court as "equity securities"

and we affirm that ruling. But even if they could be construed to include "claims", we affirm the bankruptcy court's ruling which mandatorily subordinated the Carrieri Claims, to the senior unsecured claims and equity interests, and terminated them at confirmation.

## C.  The Bankruptcy Court's Rulings

Even though the Carrieri Group did argue the following issues on appeal to the district court, that court failed to address specifically the issues below, impliedly affirming them because it did not explicitly reverse them. It is likely that the district court chose not to address these issues below because it believed that it would first require the assumption that the Carrieri Group held only "claims", not "equity securities" as the district court held and we have affirmed. But inextricably intertwined with the district court's second ruling is the determination that the Debtor did not have "legally available funds" which would give rise to an enforceable "right to payment" or "claim." As the district court did not give any reasons for its decision, we will address these four bankruptcy court rulings de novo.[20]

### 1.  The Carrieri Claims, Which Matured Post-Petition, Were Properly Disallowed By Determining That No "Legally Available Funds" Existed Under the TBCA Rather Than Under the Bankruptcy Code

The Carrieri Group contends that the bankruptcy court erred by using the TBCA instead of the Code to determine whether "legally available funds" existed to pay the Carrieri Claims. The Appellants state that the TBCA is inapplicable because it is designed

---

[20] When the district court, sitting as a court of review of the bankruptcy court, "furnishes neither reasons nor findings for its decision, [the court of appeals] in essence disregards the legal conclusions of the district court and reviews the findings, reasoning, and judgment of the bankruptcy court directly." Adler v. Hill (In re Hill), 981 F.2d 1474, 1478-79 (5th Cir. 1993).

to cover operating Texas companies rather than companies liquidating in Chapter 11. The Carrieri Group argues that its claims matured post-petition and, at least with respect to the C-2 and C-3 Rights Documents, its claims matured after the Debtor was no longer operating but in a liquidation mode. It contends that the Bankruptcy Code, rather than the TBCA, should govern the issue of "legally available funds." The Carrieri Group argues that the "insolvency" definition under the Code, essentially the "balance sheet" test, should have been used to determine the Debtor to be solvent because the Debtor's assets exceeded its liabilities and there was no legal impediment to use the funds to pay the Carrieri Claims. See 11 U.S.C. § 101(32)(A) (2000). We disagree.

The Carrieri Group's arguments lack merit and we affirm the district court's judgment because the bankruptcy court properly looked to the TBCA instead of the Code to determine whether "legally available funds" existed. The basic rule in bankruptcy is that "state law governs the substance of claims." See Raleigh v. Ill. Dep't of Revenue, 530 U.S. 15, 20 (2000). This court has agreed, stating that the validity of a creditor's claims against the debtor at the time the bankruptcy petition is filed "is to be determined by reference to state law." Kellogg v. United States (In re W. Tex. Mktg. Co.), 54 F.3d 1194, 1196 (5th Cir. 1995). Furthermore, § 502(b)(1) states that the bankruptcy court shall allow a claim except if it is unenforceable under any agreement or applicable law. Though "legally available funds" was not defined in the Rights Documents, the Debtor was a Texas corporation, the Rights Documents were issued under the TBCA, which defines "insolvency", and the Warrants were to be governed by Texas law. Consequently, the interpretation of whether there were "legally available funds" for the redemption of the

31

C-1 Stock and repurchase of the Warrants is governed by whether the Debtor was "insolvent" under Texas law, not the Code.[21] Moreover, this court has stated that it was error for a court to use just the "balance sheet" test for insolvency under the Code. See Askanase v. Fatjo, 130 F.3d 657, 674 (5th Cir. 1997) (stating that, because Texas Business & Commerce Code § 1.201(b)(23) (the Texas UCC) provides three disjunctive definitions for "insolvent", the district court erred by only using the third one, § 1.201(b)(23)(C) (the "balance sheet" test under the Bankruptcy Code), to determine that a Chapter 7 debtor was *not* insolvent). The ruling of the bankruptcy court, therefore, is affirmed because it properly decided to use Texas law, not the Code, to define "legally available funds" under the TBCA's definition of insolvency.

**2.** **Assuming that the TBCA Applied, the Carrieri Claims Were Properly Disallowed by Determining that "Legally Available Funds" Were Not Available Because the Debtor Was or Would Have Been Rendered Insolvent When the Demand Was Made or When the C-1 Stock Rights and Warrant Rights Matured**

The Carrieri Group contends that, even if the TBCA is required to determine whether the Debtor had "legally available funds" to pay the Carrieri Claims, the bankruptcy court's analysis of the TBCA when applied to the undisputed facts is clearly erroneous as a matter of law. It argues that the bankruptcy court improperly focused on Gudmundsson's earlier testimony rather than his later testimony. Gudmundsson testified

---

[21] In a case involving a nearly identical state law definition for "insolvency" as TBCA Art. 1.02A(16), a bankruptcy court in this circuit determined that the debtor-corporation was insolvent at the time of the pre-petition stock redemption and was thus entitled to avoid the transfer of consideration given to the stockholder and to turnover of that consideration under § 544. See In re La. Indus. Coatings, Inc., 31 B.R. 688, 693-95 (Bankr. E.D. La. 1983) (stating that, even though the pre-petition perfection of the stock redemption agreement made the stockholder a creditor with respect to the obligation owed to him, the debtor-corporation was insolvent under La. Rev. Stat. 12:1(L) because it was unable "to pay its debts as they become due in the usual course of business.").

earlier in the hearing that the Debtor had "around twenty million" in negative cash flow in 2000, a negative $1,357,600 for January and February of 2001, and a projected negative cash flow of $524,857 for March 2001 and, had the Debtor redeemed the C-1 Stock in March 2001, the Debtor would have run out of cash "closer to June rather than August" 2001. He later admitted under cross-examination that the Debtor had sufficient funds available in March 2001 to redeem the C-1 Stock. The Carrieri Group contends that the bankruptcy court's use of TBCA Article 1.02A(16)'s insolvency definition, the "inability of a corporation to pay its debts as they become due in the usual course of its business", was clearly erroneous as the Debtor was not "insolvent" according to Texas case law. See Parkway/Lamar Partners v. Tom Thumb Stores, 877 S.W.2d 848 (Tex. App. – Fort Worth 1994, writ denied) (holding that "insolvency" under the TBCA means an inability to pay debts as they mature, implying a reference only to existing debts). The Debtor, the Carrieri Group maintains, had sufficient cash to redeem the C-1 Stock and Warrants at the time of each tender. Finally, the Carrieri Group argues that, because all the other creditors have been paid in full and the Debtor is not "insolvent" now, the Debtor should be required to fulfill its continuing redemption obligation in full or at least "redeem the maximum possible" number of shares. We disagree.

We affirm the bankruptcy court's decision that the Debtor had no "legally available funds" to redeem the C-1 Stock or Warrants because the Debtor was insolvent or would have been rendered insolvent at the time of the demands for the following four reasons: (1) the language of the applicable law, the TBCA, allows for the use of one or more of six disjunctive factors to determine whether a corporation is insolvent and, thus, the

33

bankruptcy court did not need to use more than one of the six factors; (2) there was undisputed evidence to support the bankruptcy court's choice of the standard for insolvency based on projected economic performance, making the Parkway definition of "insolvency" inapplicable because that case dealt with the Texas UCC and a commercial lease, not a dot-com corporation; (3) the bankruptcy court's determination that the Carrieri Group failed in its burden to prove that the Debtor had "legally available funds" was not an improper application of the Code and the TBCA; and (4) even if the bankruptcy court's ruling that the Debtor had no "legally available funds" and was insolvent was in error, the determination that the Debtor would have been rendered insolvent can also be supported because the Debtor was in the "zone of insolvency."

First, the TBCA allows for the use of one or more factors to determine insolvency and does not require the use of all six. The relevant section of the TBCA states that a distribution may not be made if, "(1) after giving effect to the distribution, the corporation would be rendered insolvent. . . ." TEX. BUS. CORP. ACT ANN. art. 2.38B (Vernon Supp. 2004); see also S. Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc., 252 B.R. 373, 387 (E.D. Tex. 2000) (holding that, in one of the few federal cases to have looked at TBCA Art. 2.38B(1), patronage stock redemption claims must be treated as equity interests because Art. 2.38B(1) precludes a corporation from redeeming stock if the distribution would force the corporation into insolvency). Article 2.38-3A of the TBCA states that whether a corporation is insolvent "*may*, but is not required to, be based on" six

34

different factors.[22]  The bankruptcy court only used factor (4), a projection of future economic performance or liquidity from Gundmundsson's testimony of negative cash flow in the six months after the February 2001 initial redemption demand, as the basis for her determination that the Debtor was insolvent or would have been rendered insolvent if it had redeemed the C-1 Stock.  By the permissive "may, but is not required to" language of Article 2.38-3A, the bankruptcy court was not even required to use any of these factors if it chose not to.  Also, it is clear with the use of "or" at the end of factor (5), instead of "and", that the Texas Legislature intended these six insolvency factors to be disjunctive, not conjunctive, and we should give effect to that legislative intent.  See, e.g., Bruce v. First Fed. Sav. and Loan Ass'n of Conroe, Inc., 837 F.2d 712, 715 (5th Cir. 1988) (stating that the "word 'and' is therefore to be accepted for its conjunctive connotation rather than as a word interchangeable with 'or' except where strict grammatical construction will frustrate clear legislative intent.").  Consequently, if the bankruptcy court chose to use just one of the factors and found the Debtor insolvent based on that one factor, as it did here with factor (4), it was not then required to further analyze whether the Debtor was also insolvent using the other five factors.  It does not follow, as the Carrieri Group contends,

---

[22] The six "insolvency" factors that may be used are:
    (1) financial statements of the corporation, including subsidiaries, that present the financial condition of the corporation in accordance with the generally accepted accounting principles (GAAP);
    (2) financial statements prepared on the basis of accounting used to file the corporation's federal income tax return or any other reasonable accounting practices;
    (3) financial information, including condensed financial statements prepared on a basis consistent with (1) and (2) above;
    (4) projection, forecast, or other forward looking information relating to the future economic performance, financial condition, or liquidity of the corporation that is reasonable in the circumstances;
    (5) a fair valuation or information from any other method that is reasonable in the circumstances; or
    (6) any combination of the statements, valuations, or information authorized by this section.
TEX. BUS. CORP. ACT ANN. art. 2.38-3A (Vernon Supp. 2004) (emphasis added).

35

that the bankruptcy court should also be required to analyze whether the Debtor was

*solvent* using the other five factors especially considering that Article 2.38-3A is used to

determine *insolvency*, not *solvency*. See, e.g., Askanase v. Fatjo, 130 F.3d 657, 674 (5th

Cir. 1997) (stating that, because the Texas Business & Commercial Code § 1.201(b)(23)

provides three disjunctive definitions for "insolvent", the district court erred by only using

the third one to determine that a Chapter 7 debtor was *solvent*). Furthermore, the Carrieri

Group's "partial redemption" or "continuing redemption" argument lacks merit as it is

based on a provision with a condition precedent that was not fulfilled.[23] We affirm the

bankruptcy court's ruling that no "legally available funds" were available for the Debtor,

therefore, because the language of the TBCA allows for the use of one or more disjunctive

factors to determine whether a corporation is insolvent and the bankruptcy court need not

have used more than one factor to determine insolvency.

Second, there was undisputed evidence to support the bankruptcy court's use of

---

[23] This argument of the Carrieri Group is based on the following language,
> "[i]f at the time of any redemption or redemptions *required* pursuant to this [Section], . . . the funds of the Corporation *legally available* for redemption of Series C-1 Preferred Stock . . . [are] insufficient . . . at such time, such aggregate funds shall be used to redeem the maximum possible number of shares of Series C-1 Preferred Stock. . . . Thereafter any additional funds shall immediately be so used by the Corporation to redeem the balance of the shares which the Corporation has become *obligated* to redeem, but which it has not redeemed.

SARAI, Art. 4.11(g), 10 R. 2030; Statement, ¶ 5(d), 9 R. 1696 (emphasis added).
The problem with the Carrieri Group's "partial redemption" or "continuing redemption" obligation argument is that the above language makes it clear that the Debtor only has a partial or continuing redemption obligation if the proposed redemption was *required* pursuant to the redemption provision. As discussed below, the "partial redemption" obligation was never properly invoked by the Carrieri Group on their first demand because their failure to endorse the certificates did not trigger the redemption provision. Also, the bankruptcy court properly determined that the Debtor did not have "legally available" funds with which to pay the Carrieri Group's second redemption demand. Similarly, the "continuing redemption" was never invoked because the Debtor was never *obligated* to redeem the shares in the first place and, thus, did not have an obligation to redeem the balance. Moreover, the Carrieri Group's argument that the Debtor's post-hearing letter showed that it had sufficient funds to pay all of its creditors in full, plus pay the Carrieri Claims, ignores the fact that it relies improperly on the balance sheet test for insolvency rather than the bankruptcy court's determination of "legally available funds" under the TBCA. See supra n.15; 6 R. 854. The conditions precedent that support the "partial redemption" or "continuing redemption" obligations, therefore, were never triggered and, consequently, the Debtor did not have an obligation to redeem the C-1 Stock.

36

factor (4) under the TBCA's standard for insolvency, projected economic performance, making the Carrieri Group's definition of "insolvency" from Parkway inapplicable in this case. The Carrieri Group argues that the Parkway court advocated for the "snap shot" method of determining insolvency as only looking at "existing debts", not "future debts." See Parkway/Lamar Partners v. Tom Thumb, Stores, 877 S.W.2d 848, 850 (Tex. App. – Fort Worth 1994, writ denied) (holding that "insolvency" meant an "inability to pay debts as they mature" under the Texas Business & Commerce Code). The Parkway court, however, also stated that the definition of "insolvency" is not fixed and depends on the business or fact situation to which the term applies. See id. at 849.

Parkway dealt with a commercial real estate lease and that court deemed the grocery store tenant solvent within the meaning of the lease because the tenant had never missed a payment and did not have maturing debts greater than liquid assets. See id. at 850-51. First, Parkway is inapplicable to the case at bar because that court used the Texas Business & Commercial Code – the Texas UCC – for the definition of "insolvent" in the context of a commercial real estate tenant. Id. at 849; TEX. BUS. & COM. CODE ANN. 1.201(b)(23) (Vernon Supp. 2004). This case does not invoke the UCC, but rather the Texas Business *Corporation* Act (TBCA), and its definition of "insolvent", because it involves a proposed corporate distribution. Second, there was undisputed evidence from, inter alia, Gudmundsson's credible testimony to support the bankruptcy court's reliance on factor (4) of Article 2.38-3A to determine that the Debtor was or would be insolvent based on reasonable financial projections. See In re Jobs.com, Inc., 283 B.R. 209, 215-16 (Bankr. N.D. Tex. 2002); TEX. BUS. CORP. ACT ANN. art. 2.38-3A(4) (Vernon Supp.

37

2004).  Also, in contrast to Parkway's grocery store tenant, this case deals with Jobs.com, a dot-com company that had lost millions of dollars, was continuing to burn through cash "like crazy", and was going to run out of money in a few months, requiring it to file for bankruptcy protection to preserve its principal asset – the CBS advertising contract. Jobs.com, 283 B.R. at 216; 6 R. 772-74.  It was appropriate, therefore, for the bankruptcy court to base its determination of the Debtor's insolvency solely on factor (4) and we affirm its ruling.

Third, the bankruptcy court's determination, that the Carrieri Group failed in its burden to show that the Debtor had "legally available funds" and would not be rendered insolvent, was not improper.  After a brief review of the bankruptcy court's analysis, it is clear that we should affirm the bankruptcy court because it properly applied the Code and TBCA to place the burden on the Carrieri Group.  The bankruptcy court first found that the Carrieri Group, as claimant, bore the burden of persuasion with respect to its proof of claim under the Code.  See 6 R. Excerpt 41.  Although the court noted that there was no consensus in Texas or other state case law as to who bears the burden in an action to enforce a stock redemption agreement, the court properly analogized that the burden analysis should be the same as for claim or interest holders under Sections 502(a) and (b)(1) of the Code.  See 6 R. Excerpt 39, 41 n.3; In re Southland Corp., 160 F.3d 1054, 1059 (5th Cir. 1998); In re O'Connor, 153 F.3d 258, 260 (5th Cir. 1998) (stating that once an objection to a proof of claim is filed, the objectant must present sufficient evidence to overcome the claim's prima facie validity, and then the burden shifts to the party asserting the claim who must establish the validity of its claim by a preponderance of

38

the evidence). After the Debtor filed an objection to the proof of claim asserting that the Carrieri Group held equity interests and not unsecured claims, this was enough to overcome the prima facie validity of the Carrieri Claims. Because the Rights Documents required the Debtor to redeem the C-1 Stock and repurchase the Warrants if it had "legally available funds", under TBCA Article 2.38B, the court determined that the Carrieri Group had the burden to prove that the Debtor could make the distribution legally. The Carrieri Group, therefore, properly bore the burden to prove by a preponderance of the evidence that the Debtor had "legally available funds" and would not be rendered insolvent, under the TBCA, by redeeming the C-1 Stock. Then the bankruptcy court found that the Carrieri Group failed in its burden to prove that the Debtor would not have been rendered insolvent by a redemption, in whole or in part, of the C-1 Stock in late March 2002, when the Carrieri Group made its second demand. The bankruptcy court's ruling that the Carrieri Group had the burden to show that the Debtor had "legally available funds" and would not have been rendered insolvent by a redemption, and failed to carry it, was proper and we affirm.

Finally, although neither party addressed this argument, even if the Debtor was not actually insolvent at the time of the Carrieri Group's demands, the bankruptcy court's determination that the Debtor would have been rendered insolvent after the demands can alternatively be supported by a "zone of insolvency" analysis.[24] Gudmundsson testified

---

[24] Officers and directors that are aware that the corporation is insolvent, or within the "zone of insolvency" as in this case, have expanded fiduciary duties to include the creditors of the corporation. See Weaver v. Kellogg, 216 B.R. 563, 583-84 (S.D. Tex. 1997) (holding that, under both Delaware and Texas law, corporate insiders may have a fiduciary duty to the corporation's creditors even when the corporation was not insolvent and, thus, a plaintiff may prevail on a breach of corporate duty claim if he shows, for each wrongful transaction, that the corporation was in "the vicinity of insolvency."); Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 355 (N.D. Tex. 1996) (noting that Delaware may have expanded the

39

that members of the board of directors believed that Jobs.com was in the zone of insolvency under Texas law based on the advice of counsel at the time of their 14 March 2001 meeting. See 6 R. Excerpt 43. The Debtor's board believed then that its fiduciary duty had expanded from just the equity holders to all the stakeholders, including all creditors. See id. Once the Debtor's board of directors became aware that Jobs.com was within the zone of insolvency, they held special knowledge that was unknown to their creditors and equity holders, particularly the Carrieri Group.[25] The fact that the Debtor's board chose not to redeem the C-1 Stock pre-petition to benefit the Carrieri Group equity holders at the expense of its creditors is in accordance with their expanded fiduciary duty to all creditors because the Debtor was within the zone of insolvency. On the contrary, had the board chosen to redeem the C-1 Stock, to the detriment of creditors, at a time when they knew they were in the zone of insolvency, the board may have opened itself up to breaches of fiduciary duty claims by other creditors. See Weaver v. Kellogg, 216 B.R. 563, 583-84 (S.D. Tex. 1997). Although the bankruptcy court did not discuss "zone of insolvency" as a reason for its decision, it did expressly point out Gudmundsson's testimony that the board of directors believed the Debtor was within the "zone of insolvency" when they made their decision to deny the C-1 Stock redemption and that the board knew it needed "to file bankruptcy to try and salvage some value for *both* creditors

fiduciary duty of directors beyond a corporation's insolvency, as distinguished from the directors' fiduciary duty to the corporation, to include the period when the corporation operates within a zone of insolvency). Accordingly, when a corporation reaches the "zone of insolvency", as with actual insolvency, the officers and directors have an expanded fiduciary duty to all creditors of the corporation, not just the equity holders.

[25] The Carrieri Group admitted as much that they "had no idea that the Debtor was in financial difficulty or [was] planning to file a bankruptcy case" when it made its first demand for redemption of the C-1 Stock. Appellant's Br., at 10.

40

and shareholders." 6 R. Excerpt 43; 6 R. 772-74 (emphasis added). The bankruptcy court's decision, therefore, to use the TBCA to determine that the Debtor would have been rendered insolvent by the redemptions can also be affirmed under "zone of insolvency" analysis.

3. **Assuming the TBCA Applied, the Carrieri Claims Were Properly Disallowed by Determining that "Legally Available Funds"Were Not Available Because the Debtor Did Not Have a "Surplus" When the Demand Was Made or When the C-1 Stock Rights and Warrant Rights Matured**

The Carrieri Group argues that the bankruptcy court erred in determining that no "legally available funds" were available to redeem the Carrieri Claims because the Debtor did not have a "surplus", as defined by the TBCA, at the time of the demand or at the time the claims matured. It contends that: (1) the bankruptcy court focused on the "insolvency" factor in TBCA Article 2.38B(1) but ignored the "surplus" exceeding factor in Article 2.38B(2); (2) the bankruptcy court should have considered Article 2.38C(2)(d) of the TBCA, allowing the corporation to redeem its shares if the net assets are not less than the amount of the proposed distribution, even though this argument was not raised until the motion for rehearing; and (3) the bankruptcy court's ruling is totally inconsistent with Article 2.38E, which states that a corporation's indebtedness to a shareholder incurred by a distribution shall be at parity with the corporation's indebtedness to its general, unsecured creditors. The bankruptcy court's ruling, the Carrieri Group maintains, improperly places its distribution rights not only not on parity with unsecured claims, but also below that of shareholders who have no distribution rights and against whom creditor claims are to be protected under the TBCA. We disagree.

41

We affirm the ruling of the bankruptcy court that the Debtor had no "legally available funds" to redeem the Carrieri Claims because the Debtor did not have a "surplus" under the TBCA for three reasons: (1) as with the "insolvency" factors, Article 2.38B presents two disjunctive restrictions on a corporation's ability to make a distribution and the bankruptcy court need not have analyzed whether the distribution would have exceeded the "surplus" of the corporation, under Article 2.38B(2), if it already determined that the Debtor would be insolvent under Article 2.38B(1); (2) the Carrieri Group's Art. 2.38C(2)(d) argument, made in a post-trial motion, may have been waived on appeal, but even if it was preserved, and even if "surplus" under Article 2.38B(2) is ignored, the bankruptcy court need not have even considered Article 2.38C(2)(d) because the record shows that the Carrieri Group failed in its burden to prove that the Debtor's proposed distribution would not have rendered it insolvent under Article 2.38B(1); and (3) the bankruptcy court's ruling is consistent with Article 2.38E because the Debtor was not "indebted" to the Carrieri Group, and even if it was, the Rights Documents provided that the Carrieri Claims were subordinated by agreement, falling within an exception to Article 2.38E.

First, as with the six "insolvency" factors, Article 2.38B presents two disjunctive restrictions (not a two-pronged conjunctive test as the Debtor alleges) on a corporation's ability to make a distribution. TBCA Article 2.38B states that a distribution may not be made if: "(1) after giving effect to the distribution the corporation would be insolvent; *or* (2) the distribution exceeds the surplus of the corporation." TEX. BUS. CORP. ACT ANN. art. 2.38B (Vernon Supp. 2004) (emphasis added). "Surplus" is defined as "the excess of

the net assets[26] of a corporation over its stated capital."[27] TEX. BUS. CORP. ACT ANN. art. 1.02A(27) (Vernon Supp. 2004). The bankruptcy court need not have analyzed whether the distribution would have exceeded the "surplus" of the corporation, under Article 2.38B(2), because it had already determined that the Debtor would be insolvent under Article 2.38B(1). We therefore affirm the bankruptcy court's ruling.

Second, the Carrieri Group's Article 2.38C(2)(d) argument, made in a post-trial Rule 59(e) motion to the bankruptcy court, may have been waived on appeal. Rule 59(e) motions generally "cannot be used to raise arguments which could, and should, have been made before the judgment issued" and "cannot be used to argue a case under a new legal theory."[28] Even though it appears that these arguments could, and should, have been made before the bankruptcy court judgment issued, and are not really new "issues", we will give the Carrieri Group the benefit of the doubt that its arguments based on Article 2.38C(2)(d) and Parkway[29] "raised" new issues and were properly preserved for this appeal. Nevertheless, even if the Article 2.38C(2)(d) argument was preserved for appeal,

---

[26] "Net assets" are defined as the "amount by which the total assets of a corporation exceed the total debts of the corporation." TEX. BUS. CORP. ACT ANN. art. 1.02(A)(19) (Vernon Supp. 2004).

[27] "Stated capital" means "the sum of: (a) the par value of all shares of the corporation having a par value that have been issued; (b) the consideration fixed by the corporation . . . for all shares . . . without par value that have been issued, . . .; and (c) such amounts not included in . . . (a) and (b) . . . as have been transferred to stated capital . . . minus all reductions from such sum as . . . permitted by law." TEX. BUS. CORP. ACT ANN. art. 1.02(A)(24) (Vernon Supp. 2004).

[28] Pluet v. Frasier, 355 F.3d 381, 384 n.2 (5th Cir. 2004). Issues raised for the first time in post-judgment motions, however, are preserved for appeal. See Instone Travel Tech Marine & Offshore v. Int'l Shipping Partners, Inc., 334 F.3d 423, 431 n.7 (5th Cir. 2003); N.Y. Life Ins. Co. v. Brown, 84 F.3d 137, 141 n.4 (5th Cir. 1996).

[29] Although it was not cited in its motion for a new trial, counsel for the Carrieri Group cited the Parkway/Lamar Partners, L.P. v. Tom Thumb, Stores, Inc., 877 S.W.2d 848 (Tex. App. – Fort Worth 1994, writ denied) case, as discussed above about the proper Texas law definition of "insolvency" to be used here, for the first time during the Rule 59(e) hearing.

43

and even ignoring the "surplus" test for insolvency as required,[30] the bankruptcy court need not have even considered Article 2.38C(2)(d) if it found that the Carrieri Group failed in its burden to show that the Debtor would not be rendered insolvent under Article 2.38B(1). As discussed above, the bankruptcy court properly ruled that the Carrieri Group failed in its burden to show that the Debtor would not have been rendered insolvent by the distribution, and we affirm to the extent it relates to Article 2.38C(2)(d).

Furthermore, notwithstanding the Article 2.38C(2)(d) argument, the bankruptcy court also properly found that the Carrieri Group failed in its burden to show that the proposed distribution would not have exceeded its "surplus." As stated above, the bankruptcy court properly placed the burden on the Carrieri Group to show that the Debtor had "legally available funds" and would not have been rendered insolvent. Similarly, the bankruptcy court applied the Code and TBCA Article 2.38B(2) to place the burden on the Carrieri Group to show that the proposed distribution would not have exceeded its "surplus." The bankruptcy court found that the Carrieri Group offered no evidence regarding the calculation of the "surplus" and, thus, it failed to carry its burden. See 6 R. Excerpt 44. We therefore affirm the bankruptcy court's application of the Code and the TBCA to place the burden on the Carrieri Group to prove that the distribution

---

[30] Article 2.38C(2)(d) states that, notwithstanding the "surplus" limitation on distributions in Article 2.38(B):
 . . . if the net assets of a corporation are not less than the amount of the proposed distribution:
 . . .
 (2) the corporation may make a distribution involving a purchase or redemption of any of its own shares if the purchase or redemption is made by the corporation to:
 . . .
 (d) effect the purchase or redemption of redeemable shares in accordance with this Act; . . .
 TEX. BUS. CORP. ACT ANN. art. 2.38C(2)(d) (Vernon Supp. 2004).

would not exceed the Debtor's "surplus."

Finally, in contrast to the Carrieri Group's argument, the bankruptcy court's ruling is consistent with Article 2.38E[31] for a couple of reasons. First, as stated above, the district court properly held that the Carrieri Claims are "equity securities", not "claims" which would give rise to an indebtedness as the bankruptcy court found. The Debtor would, thus, not become "indebted" to the Carrieri Group until it was legally eligible to make a distribution, and, under Article 2.38E, the Debtor may not make a distribution if it would violate another section of this Article, namely Article 2.38B's "insolvent" or "surplus" requirements. The bankruptcy court properly found that the Debtor either was insolvent or would have been rendered insolvent at the time of the demands. Second, even if the Debtor was "indebted" to the Carrieri Group, through independent "claims", the Rights Documents stated that the C-1 Stock and Warrants were subordinated by agreement, providing an exception to Article 2.38E. As discussed above, at the time of the merger, in exchange for the C-1 Stock and Warrants, the Rights Documents provided that the Carrieri Group subordinated its equity interests to those of senior preferred equity holders, such as the Kania Appellees, in the event of liquidation. See supra Part.II.B.2 & text accompanying note 19. The bankruptcy court's ruling, therefore, that no "legally available funds" were available to redeem the C-1 Stock and repurchase the Warrants due to the Debtor not having a "surplus", as defined by the TBCA, is affirmed because it is

---

[31] Article 2.38E provides:
> A corporation's indebtedness to a shareholder incurred by reason of a distribution made in accordance with this Article shall be at parity with the corporation's indebtedness to its general, unsecured creditors, *except* to the extent the indebtedness is subordinated, or payment of that indebtedness is secured, by agreement.

TEX. BUS. & CORP. ACT ANN. art. 2.38E (Vernon Supp. 2004) (emphasis added).

consistent with Article 2.38E.

### 4. The Carrieri Claims for the C-1 Stock Were Also Properly Disallowed Simply Because the Carrieri Group Initially Failed to Endorse Them

Finally, the Carrieri Group contends that the bankruptcy court should not have disallowed its claims just because it initially failed to endorse the stock certificates. First, it argues that, while the stock certificates were inadvertently not endorsed on the first demand, they were duly endorsed on the second demand. Second, they argue that bankruptcy courts often allow a post-petition act to cure a deficiency, which was ministerial here, see Soares v. Brockton Credit Union (In re Soares), 107 F.3d 969, 974 (1st Cir. 1987), thus, the second demand should relate back to the first because strict compliance with technical requirements elevates form over substance and hinders the court's responsibility to "do equity." See Otto v. Texas Tamale Co. (In re Texas Tamale Co.), 219 B.R. 732, 740 (Bankr. S.D. Tex. 1998). Finally, even if the second tender does not relate back, the Carrieri Group asserts that the subsequent tender completes the initial demand because it was made after 22 March 2001, and the C-1 Rights Document provides that the Debtor's obligation to redeem is a continuing one after the first demand regardless of the "legally available funds" on hand at that time. We disagree.

The bankruptcy court's ruling disallowing the Carrieri Claims for initially failing to endorse the stock certificates was proper for three reasons: (1) the Carrieri Group's initial redemption demand was defective under the C-1 Rights Document's "duly endorsed" requirement; (2) even if the second tender cured the endorsement defect, and relates back to the first demand, the second demand is not allowable because the Debtor did not have

46

"legally available funds" in March 2001, or after the Petition Date, and the bankruptcy court properly disallowed the Carrieri Claims; and (3) the only cases the Carrieri Group cited, Soares and Texas Tamale, are easily distinguishable from the facts of this case and do not support the Carrieri Group's argument that the bankruptcy court should have equitably ignored its defective tenders.

The Carrieri Group's initial redemption demand was defective under the C-1 Rights Document's "duly endorsed or assigned to the corporation or in blank" requirement for redemption and was properly disallowed under § 502(b)(1).  On 20 February 2001, the Carrieri Group made its first written demand for redemption of the C-1 Stock, specifying a redemption date of 22 or 23 March 2001.  It returned the stock certificates but failed to duly endorse or assign them to the Debtor or in blank, as the C-1 Rights Document expressly stated.  The Debtor returned the stock certificates to the Carrieri Group on 9 March 2001, indicating that its tender attempt did not satisfy the requirements of the C-1 Rights Document.  The bankruptcy court found that the Carrieri Group's first attempt to redeem the C-1 Stock  was unenforceable because it failed to endorse or assign its shares to the Debtor "as the [C-1 Rights Document] plainly required."  6 R. Excerpt 41.  The bankruptcy court shall allow a claim except to the extent it is "unenforceable against the debtor . . . under any agreement or applicable law."  11 U.S.C. § 502(b)(1) (1994).  In this case, the Carrieri Claims were unenforceable against the Debtor under any agreement – the C-1 Rights Document.  Therefore, we affirm the bankruptcy court's ruling disallowing the Carrieri Group's initial redemption demand under § 502(b)(1) because that court properly found that the Carrieri Group failed to

47

comply with the "duly endorsed" requirement.

Even if the second tender cured the endorsement defect, and relates back to the first demand, the second redemption demand was properly disallowed by the bankruptcy court because the Debtor neither had "legally available funds" to redeem the C-1 Stock in March 2001 nor after the Petition Date. After receiving the rejected stock certificates in March of 2001, the Carrieri Group did not formally inquire as to the reason why its redemption attempt was defective, even though the Debtor had written in the letter with the returned certificates that the tender failed to satisfy the requirements of the C-1 Rights Document. The Carrieri Group failed to remedy its defective tender for more than one year, until March 2002, which was one year after the Debtor filed for bankruptcy. Furthermore, with regards to the Carrieri Group's third argument, we have already discussed above why the Debtor did not have a "continuing redemption" obligation. The bankruptcy court found that, therefore, the Carrieri Group's second redemption demand in March 2002, as with its first demand in March 2001, was also unenforceable against the Debtor because it did not have "legally available funds", with which to make the proposed redemptions. Thus the bankruptcy court properly disallowed the Carrieri Claims under § 502(b)(1) and the TBCA, and we affirm.

Finally, the only cases the Carrieri Group cited, Soares and Texas Tamale, are easily distinguishable from the facts of this case and do not support the Carrieri Group's argument that this court should equitably ignore its defective tenders. The Carrieri Group states that the Soares court held that "routine scrivening, such as recordation or entry on the docket" is ministerial. See Soares v. Brockton Credit Union (In re Soares), 107 F.3d

48

969, 974 (1st Cir. 1987). They claim that their failure to endorse the C-1 Stock certificates was a routine act that was equally ministerial and should be overlooked. The Soares court, however, dealt with whether the recordation of a docket entry by the *clerk of court*, following a judicial decision, was ministerial and, thus, did not violate the § 362 automatic stay under the Code. See id. Soares clearly does not apply here, first because that court actually held that the state court's recordation of a post-petition order was *not* ministerial and *did* violate § 362. See id. at 978. Second, the facts of Soares are easily distinguishable from our facts here. It is hard to see how a clerical act by the clerk of a court, under the direction of a judge, can logically be compared to an affirmative act by stockholders to exercise their stock redemption rights.

The Carrieri Group also claims that Texas Tamale holds that the bankruptcy court's responsibility to "do equity" will be hindered because strict compliance with technical requirements, such as the "duly endorsed" requirement, will elevate form over substance. See Otto v. Texas Tamale Co. (In re Texas Tamale Co.), 219 B.R. 732, 739-40 (Bankr. S.D. Tex. 1998). The Texas Tamale court cited a Fifth Circuit case that allegedly "edged away from formal strict compliance of the notice requirement." Id. at 739 (citing Robbins v. Amoco Production Co., 952 F.2d 901, 908 (5th Cir. 1992)). While "[i]t would be the height of inequity to impair [a] creditor's rights without giving [the creditor] an opportunity to participate in the reorganization process", the Texas Tamale court held that the creditor failed to protect his rights by timely filing a proof of claim, and that the creditor's actual notice of the debtor's bankruptcy was sufficient to satisfy Fifth Amendment due process requirements. Id. at 738, 740.

49

Texas Tamale, thus, does not apply to this case for two reasons. First, Texas Tamale dealt with the notice requirement under the Fifth Amendment, not a "duly endorsed" requirement for a stock certificate. Second, Texas Tamale's holding does not actually support the Carrieri Group's proposition that the bankruptcy court here should have used its equitable powers to overlook the failure to "duly endorse" the stock certificates. The Texas Tamale court actually concluded that it would choose *not* to use its equitable power to overlook the fact that the creditor failed to file timely his proof of claim because it determined that the creditor had actual notice. Id. at 739-40. Similarly, the bankruptcy court here chose not to overlook the "duly endorsed" requirement because it listed this failure as the first reason to disallow the attempted redemption. See In re Jobs.com, Inc., 283 B.R. 209, 214 (Bankr. N.D. Tex. 2002). The bankruptcy court, therefore, properly ruled that the Carrieri Group's first attempted redemption in February 2001 of the C-1 Stock was defective, due to an endorsement failure, and we affirm that ruling. We also affirm the bankruptcy court's ruling properly that the second redemption demand of the C-1 Stock and the first repurchase demand for the Warrants in late March 2002 failed due to the Debtor's not having "legally available funds."

## IV. CONCLUSION

Based on the foregoing analysis, we AFFIRM the district court's final judgment affirming the bankruptcy court's order disallowing the Carrieri Claims because they are "equity securities" under the Code. To the extent necessary to support the district court's second ruling that the Carrieri Group did not also hold "claims" independent of their equity interests, we AFFIRM the bankruptcy court's four rulings as discussed above.