**CUMBRE DEVELOPMENT CORPORATION,**
Appellant,

v.

**KISTENMACHER ENGINEERING COMPANY, INC. and G. Glen Kistenmacher, P.E., Appellees.**

No. EP–05–CA–51–PRM.

United States District Court,
W.D. Texas,
El Paso Division.

March 23, 2006.

748

Robert A. Skipworth, Attorney at Law, El Paso, TX, for Appellant.

Norman J. Gordon, Mounce Green Myers Safi Galatzan, El Paso, TX, for Appellees.

### ORDER AFFIRMING THE JUDGMENT OF THE UNITED STATES BANKRUPTCY COURT

MARTINEZ, District Judge.

On this day, the Court considered Cumbre Development Corporation's ("Cumbre") appeal from the October 28, 2004 Judgment of the United States Bankruptcy Court for the Western District of Texas ("Bankruptcy Court"). After considering Cumbre's brief, the brief of Appellees G. Glen Kistenmacher, P.E. ("Kistenmacher") and Kistenmacher Engineering Company, Inc. ("KEC"), and the record on appeal, the Court is of the opinion that the judgment of the Bankruptcy Court should be affirmed for the reasons set forth below.

### I. Procedural & Factual History

Kistenmacher is a licensed professional engineer and president of KEC. Kistenmacher's Br. 3; Cumbre's Br. 4. James Woodahl ("Woodahl") is a developer and president of Cumbre. Cumbre's Br. 4, 9. Kistenmacher and KEC first performed services for a Woodahl project known as La Elegancia. Cumbre's Br. 4. In connection with the La Elegancia project, neither Kistenmacher nor KEC were compensated for $16,369 worth of services. Adversary Hr'g Tr. vol. 1, 14, Mar. 24, 2004; Kistenmacher's Ex. 1. Despite the outstanding indebtedness, on January 15, 1997, the parties entered into two agreements whereby Kistenmacher and KEC agreed to act as engineer on a new Woodahl development—Cumbre Estates. Cumbre's Br. 4.

Allegedly, Cumbre also neglected its obligation to compensate Kistenmacher and KEC for services performed on the Cumbre project. Kistenmacher's Br. 3. Accordingly, on July 3, 2000, Kistenmacher and KEC resigned from the project by sending a letter seeking to dissolve the existing business relationship and demanding various items in repayment of all outstanding debts. Cumbre's Br. 4–5; Kistenmacher's Br. 3; Kistenmacher's Ex. 7. On July 25, 2000, Cumbre, Kistenmacher, and KEC reconstituted their business relationship by executing two new agreements. Cumbre's Br. 5; Kistenmacher's Br. 3. The first agreement was a performance contract ("July 25, 2000 Agreement"), in which Kistenmacher and KEC committed to finalizing all pending engineering design work, obtaining final approvals, and remaining the responsible engineer of record for the Cumbre Development. Cumbre's Br. 5; Cumbre's Ex. 2; Kistenmacher's Ex. 9. Second, Cumbre executed a "Promissory Note" in favor of Kistenmacher and KEC for $151,851.50 with a one year maturity date. Cumbre's Br. 5; Kistenmacher's Ex. 8. The Promissory Note represented the amount Cumbre owed Kistenmacher and KEC as of June 30, 2000, less certain deductions. Kistenmacher's Ex. 9; Cumbre's Ex. 2; Adversary Hr'g Tr. vol. 2, 36.

On January 3, 2001, Kistenmacher wrote a letter to the El Paso Water Utilities Public Service Board ("PSB") indicating Cumbre's desire to execute two development agreements with the PSB: one relating to the water and sewer mains, and the other relating to the booster station and its appurtenances. Cumbre's Br. 6; Cumbre's Ex. 18. On January 25, 2001, Cumbre entered into the first development agreement with the PSB, relating to the water distribution and sanitary sewer systems. Kistenmacher's Ex. 19. On April 9, 2001, Cumbre entered into the second development agreement with the PSB, which stated that "the PSB will design the system referred to below (the 'Plans') at a

charge of 4% of the construction cost estimated by the PSB." Kistenmacher's Ex. 20; Cumbre's Ex. 27. The "system referred to below" was listed as the booster station. Kistenmacher's Ex. 20; Cumbre's Ex. 27. However, addendum 1 to the second development agreement stated that Cumbre had "contracted the design and installation of the proposed booster station." Kistenmacher's Ex. 20; Cumbre's Ex. 27.

On October 3, 2001, the Texas Natural Resource Conservation Commission ("TNRCC") wrote a letter to the PSB informing it that the Cumbre booster station did not comply with the Texas Administrative Code. Kistenmacher's Ex. 18; Cumbre's Ex. 30. The letter further informed the PSB that it should have requested an exception from the TNRCC prior to building the station. Kistenmacher's Ex. 18; Cumbre's Ex. 30. For the next year, Cumbre and the PSB tried to obtain an exception from the TNRCC for the Cumbre booster station. *See* Cumbre's Exs. 33–34, 39, 42, 45–47 (exhibits relating to Cumbre's and the PSB's attempts to obtain an exception for the Cumbre booster station). However, on October 4, 2002, the TNRCC officially rejected any exception for the Cumbre booster station. Cumbre's Ex. 48.

Meanwhile, in November 2001, Kistenmacher withdrew from the Cumbre project due to Cumbre's continued nonpayment under both the July 25, 2000 Agreement and the Promissory Note. Kistenmacher's Br. 3; Kistenmacher's Ex. 11. In December 2001, Kistenmacher and KEC filed suit in state court seeking recovery under the Promissory Note. Kistenmacher's Br. 3; Cumbre's Br. 3. In response, Cumbre filed a counterclaim alleging breach of contract and negligence on the part of Kistenmacher and KEC with respect to the design of the booster station. Kistenmacher's Br. 3;

Cumbre's Br. 3. Cumbre thereafter filed for Chapter 11 protection, and the case was removed to bankruptcy court. Kistenmacher's Br. 3; Cumbre's Br. 3. In 2003, the Chapter 11 proceeding was converted to a Chapter 7 proceeding. Kistenmacher's Br. 4. On March 24 and 25, 2004, the Bankruptcy Court held an adversary hearing. Cumbre's Br. 3. On October 6, 2004, the Bankruptcy Court issued findings of fact and conclusions of law ("FFCL"). On October 28, 2004, the Bankruptcy Court issued its final judgment. Cumbre now presents this appeal pursuant to 28 U.S.C. § 158(a)(1).

## II. Issues Appealed

Cumbre appeals the following five issues:

1. Did the Honorable Bankruptcy Court err in its Conclusion that Appellees did not breach the July 25, 2000 Agreement in regards to the booster station, i.e. that the evidence failed to establish Appellees [sic] design of the booster station?

2. Did the Honorable Bankruptcy Court err in its Findings and Conclusions that Appellees were not negligent in regards to the booster station?

3. Did the Honorable Bankruptcy Court err in its Findings that the disapproval of the booster station by the TNRCC was not a proximate cause of the failure of the development?

4. Did the Honorable Bankruptcy Court err in concluding that there was no credible evidence of damages?

5. Did the Honorable Bankruptcy Court err in awarding the Appellees any money on the basis of the promissory note, the payment of which

was conditioned on performance under the Agreement of even date? Cumbre's Br. 1.

## III. Legal Standard

 A district court reviews a bankruptcy court's findings of fact for clear error and its conclusions of law *de novo.*[1] *Carrieri v. Jobs.com, Inc.,* 393 F.3d 508, 517 (5th Cir.2004). A district court will only reverse for clear error if, after reviewing the entire record, the court is convinced that a mistake has been made. *Id.* However, a finding of fact based on an erroneous or improperly applied legal standard is reviewed *de novo. Id.*

## IV. Discussion

### A. Breach of Contract

 The first issue on appeal is "Did the Honorable Bankruptcy Court err in its Conclusion that Appellees did not breach the July 25, 2000 Agreement in regards to the booster station, i.e. that the evidence failed to establish Appellees [sic] design of the booster station?" Cumbre's Br. 15. This issue requires the Court to interpret Kistenmacher and KEC's obligations under the disputed contract. The interpretation of a contract is a question of law, which an appellate court reviews *de novo. In re Homeowners Mortgage & Equity, Inc.,* 354 F.3d 372, 375 (5th Cir.2003). Initially, the Court must determine whether the contract at issue is ambiguous or unambiguous because this determination impacts the applicable standard of review.

*Stinnett v. Colo. Interstate Gas Co.,* 227 F.3d 247, 254 (5th Cir.2000). The interpretation of ambiguous contracts implicates questions of fact subject to a clearly erroneous standard of review. *Id.; Columbia Gas Transmission Corp. v. New Ulm Gas,* 940 S.W.2d 587, 589 (Tex.1996).[2] However, the interpretation of unambiguous contracts is a question of law, subject to *de novo* review on appeal. *Stinnett,* 227 F.3d at 254.

 This threshhold determination of whether a contract is ambiguous is also a question of law. *Id.* This determination is made by reviewing the contract as a whole in light of the circumstances existing when the contract was executed. *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589; *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). If a contract can be given a definite or certain meaning, it is unambiguous and must be enforced as written. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003). However, if a contract's meaning is uncertain, doubtful, or reasonably susceptible to more than one interpretation, it is ambiguous, creating a fact issue on the parties' intent. *Id.; Coker,* 650 S.W.2d at 393. If a contract is ambiguous, a court may look to extrinsic evidence to determine the parties' intent. *Transamerican Natural Gas Corp. v. Zapata P'ship, Ltd.,* 12 F.3d 480, 486 (5th Cir.1994).

The Bankruptcy Court implicitly found that the July 25, 2000 Agreement was ambiguous by considering extrinsic evidence to determine the parties' intent.[3]

---

1. This standard is also provided in Bankruptcy Rule 8013:

 On appeal the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the

 bankruptcy court to judge the credibility of the witnesses.

2. It is undisputed that Texas law governs the interpretation of the disputed contract.

3. In addition to the written contract, the Bankruptcy Court considered testimony regarding the industry custom in El Paso County for the design of residential subdivision

Having reviewed the contract as a whole and the surrounding circumstances that existed when the contract was executed, the Court concludes that the July 25, 2000 Agreement is ambiguous as a matter of law.

Kistenmacher and KEC's stated duties under the challenged July 25, 2000 Agreement included: (1) continuing to be the engineer of record; (2) remaining the responsible engineering firm for Unit One and Unit Two of Cumbre Estates; (3) finalizing all pending engineering design work; (4) obtaining the complete and final approvals for those phases they are involved in of Cumbre Estates; (5) continuing to support the project during the complete construction period; (6) providing necessary consultation and/or modification to the design when required; and (7) fulfilling their obligations under the Agreement. Cumbre argues that Kistenmacher and KEC "were engaged in the design of the booster station well before the Agreement of July 25, 2000 was signed. Therefore, the design was an obligation contemplated by the parties when that Agreement was signed." Cumbre's Br. 18. Kistenmacher and KEC argue that the design of the booster station was not within the scope of services under the original 1997 agreement or the superseding July 25, 2000 Agreement. Kistenmacher's Br. 5, 10.

Given the vague language of the July 25, 2000 Agreement, either of these arguments could possibly be correct. Notably, there is no provision in the July 25, 2000 Agreement which clearly and specifically defines the scope of the parties' obligations. Instead, most of the duties are stated broadly or rely on collateral matters to derive meaning. Clearly, no part of the July 25, 2000 Agreement explicitly states that Kistenmacher or KEC is responsible for the design of the booster station. However, the phrase "GGK and KEC hereby commit to finalizing all pending engineering design work" could possibly implicate this duty. Yet, it is impossible to ascertain whether the design of the booster station was "pending engineering design work" on July 25, 2000 without resorting to extrinsic evidence. Regrettably, no other language in the contract illuminates the meaning of this provision. Furthermore, the surrounding circumstances under which the contract was entered do not provide clarity. Accordingly, the Court concludes that the July 25, 2000 Agreement is ambiguous because Kistenmacher and KEC's duties are uncertain, are reasonably susceptible to more than one interpretation, and inherently depend on extrinsic evidence for meaning. *See* RESTATEMENT SECOND (CONTRACTS) § 212, cmt. e (1981) (noting that when the meaning of a contract depends on extrinsic evidence, its interpretation should be left to the trier of fact).

Having determined that the contract is ambiguous, the Court will defer to the Bankruptcy Court's determination of the parties' intent under the contract absent a showing of clear error. *Transamerican Natural Gas Corp.*, 12 F.3d at 485 (noting that when faced with an ambiguous contract, an appellate court accepts a bankruptcy court's factual findings concerning the parties' intent unless clearly erroneous). Under a clear error review, a district court will only reverse if, " 'on the entire evidence, [the court] is left with the definite and firm conviction that a mistake

water systems, testimony regarding various parties' understandings of the scope of Kistenmacher and KEC's duties under the 1997 and 2000 agreements, and the development agreement executed between Cumbre and the PSB nearly a year after July 25, 2000 concerning the design and construction of the booster station.

has been made.'" *Carrieri*, 393 F.3d at 517 (quoting *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 565 (5th Cir.1995)). In conducting a clear error review, a court must be "particularly mindful of 'the opportunity of the bankruptcy judge to determine the credibility of the witnesses.'" *Matter of Young*, 995 F.2d 547, 548 (5th Cir.1993) (quoting Bankruptcy Rule 8013). Furthermore, where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

Cumbre specifically challenges three findings of fact underlying the Bankruptcy Court's determination that the parties did not intend for Kistenmacher and KEC to have a contractual obligation to design the booster station: (1) "There was no credible evidence in the record to show that the general understanding from 1997 as to the design of the water system within the purview of the El Paso Public Service Board had changed between 1997 and July 25, 2000, the date of the subsequent agreement between Kistenmacher and Cumbre." FFCL at 16; (2) "There was no testimony to show that Kistenmacher was, on July 25, 2000, involved in the design of a water system for Cumbre." FFCL at 17; (3) "There was no evidence that the El Paso Public service Board had, at that point, July 25, 2000, made any determination that its engineers would not be handling the design of the water system." FFCL at 18.

The first and third finding essentially challenge the same thing—the Bankruptcy Court's determination that, in July 2000, the industry custom in El Paso, Texas was for the PSB to design subdivision water systems and to bill the developers for the design work. FFCL at 15, 29–30. The Court concludes that this finding is well supported by the record and, therefore, not clearly erroneous. *See* Adversary Hr'g Tr. vol. 2, 149 (testimony of Armondo Gonzalez, PSB head of in-house engineering design, agreeing that the PSB usually designs the water distribution systems of El Paso developments); Adversary Hr'g Tr. vol. 2, 136 (testimony of Sal Masoud ("Masoud"), Cumbre project manager, acknowledging that the common practice of the PSB was to design its own water systems and that a booster station is "part and parcel of a completed water system."); Adversary Hr'g Tr. vol. 2, 202 (testimony of John Karlsruher explaining that, in El Paso, consulting engineers such as Kistenmacher are not allowed to design subdivision water and sewer systems because it is the duty of the PSB); Kistenmacher's Ex. 19 & Cumbre's Ex. 27 (development agreements executed between the PSB and Cumbre, written by the PSB, containing boiler plate language which places design responsibility for the water system, sewer system, and booster station on the PSB).[4] The only evidence that existed prior to July 25, 2000 which casts doubt on the Bankruptcy Court's finding is the April 28, 2000 letter from the PSB to Cumbre, which references information submitted by Kistenmacher to the PSB regarding the booster station. Cumbre asserts that this

---

4. While there is some internal conflict in the April 1, 2001 development agreement regarding the design responsibility for the booster station, the conflicting language does not connect Kistenmacher to the duty to design the booster station. Kistenmacher's Ex. 20; FFCL at 20–22. The Bankruptcy Court aptly noted that Kistenmacher is not listed as a responsible party anywhere in the April 2001 development agreement nor is he a signatory. More importantly, it does not demonstrate that, as of July 25, 2000, the PSB had on this occasion departed from its normal practice of designing the complete water systems for El Paso subdivisions.

letter clearly demonstrates that, prior to July 25, 2000, the PSB was looking to Cumbre and Kistenmacher to design the booster station. However, the Bankruptcy Court determined that this letter simply was requesting information regarding the pumps. Clearly, this is a situation where there exist two permissible views of the evidence. In such a situation, the clearly erroneous standard of review compels the Court to defer to the Bankruptcy Court's decision. *See Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504 (noting that the fact-finder is the proper party to choose between two permissible views of the evidence).

Additionally, the Court concludes that the Bankruptcy Court's finding that "there was no testimony to show that Kistenmacher was, on July 25, 2000, involved in the design of a water system for Cumbre" is not clearly erroneous. FFCL at 16. Most of the evidence proffered by Cumbre to demonstrate that Kistenmacher was involved in the design of the booster station did not exist on July 25, 2000. Additionally, the little evidence which existed before July 25, 2000 does not demonstrate clear error on the part of the Bankruptcy Court. Again, Cumbre asserts that the April 28, 2000 letter from the PSB to Cumbre indicates that Kistenmacher was involved in the design of the booster station. However, Kistenmacher and the Bankruptcy Court interpreted the letter merely as a request for information. Cumbre directs the Court to hours billed by Kistenmacher both before and after July 25, 2000 involving the design of the booster station. However, Kistenmacher asserts that these hours represent design work on the building that would contain the pumping system. Cumbre asserts that Masoud testified that the design of the booster station was pending on July 25, 2000. However,

Masoud further testified that he did not know if this was a design for which Kistenmacher was responsible. Adversary Hr'g Tr. vol. 2, 142. Also, he testified that the design of the water system was normally handled by the PSB. Adversary Hr'g Tr. vol. 2, 136. Again, the parties both assert plausible interpretations of the evidence. Consequently, by definition, the Bankruptcy Court's resolution of the issue was not clearly erroneous. *See Anderson*, 470 U.S. at 573–74, 105 S.Ct. 1504 (noting that a fact-finder's choice between two permissible views of the evidence cannot be clearly erroneous). Furthermore, considering all of the evidence, the Court is not left with a definite and firm conviction that the Bankruptcy Court clearly erred in finding that as of July 25, 2000 Kistenmacher was not involved in the design of the booster station. *See Carrieri*, 393 F.3d at 517 (providing that clear error arises only when a reviewing court is left with a definite and firm conviction that a mistake has been made).

In conclusion, the Court holds that Kistenmacher and KEC's obligations under the July 25, 2000 Agreement were ambiguous as a matter of law. The Court further holds that the Bankruptcy Court's determination that the parties did not intend for Kistenmacher or KEC to be responsible for the design of the booster station was not clearly erroneous. Rather, all of the essential facts relied upon by the Bankruptcy Court are well supported by the record.

*B. Negligence*

■ The second, third, and fourth issues Cumbre appeals all concern the Bankruptcy Court's findings and conclusions that Kistenmacher and KEC were not negligent with respect to the booster

station.[5] To sustain a claim for negligence a plaintiff must show that (1) the defendant owed a legal duty to the plaintiff, (2) the defendant breached that duty, and (3) the defendant's breach proximately caused the plaintiff's damages. *IHS Cedars Treatment Center of DeSoto, Texas, Inc. v. Mason,* 143 S.W.3d 794, 798 (Tex.2004).

Based on the record on appeal, it is doubtful that Kistenmacher or KEC owed Cumbre a duty. Cumbre asserts that Kistenmacher and KEC owed Cumbre a duty based on the parties' contract or based on duties assumed by Kistenmacher and KEC. As discussed above, we affirm the Bankruptcy Court's determination that there was no contractual duty for Kistenmacher or KEC to design the booster station. Correspondingly, the contract cannot serve as the basis for Cumbre's negligence claim. In the alternative, Cumbre argues that Kistenmacher or KEC "assumed responsibilities for the water booster equipment that required him to use his skill as an engineer." Cumbre's Br. 21. It is not clear whether Cumbre properly raised this assumed duty argument before the Bankruptcy Court. The Bankruptcy Court did not issue any findings or conclusions relating to this argument. Accordingly, the Court's ability to review this alternative argument is severely circumscribed. Nonetheless, the Bankruptcy Court's finding that Cumbre failed to demonstrate that its injuries were proximately caused by Kistenmacher or KEC's conduct is an independent and sufficient reason to uphold the Bankruptcy Court's determination that Kistenmacher and KEC were not negligent.

To prevail on a negligence claim, the injured party must demonstrate that the defendant's act or failure to act was a proximate cause of the plaintiff's injury. *First Assembly of God, Inc. v. Tex. Utils. Elec. Co.,* 52 S.W.3d 482, 491 (Tex.App.—Dallas 2001, no pet.). The elements of proximate cause are cause-in-fact and foreseeability. *Mason,* 143 S.W.3d at 798. A plaintiff may not satisfy these elements with mere conjecture, guessing, or speculation. *Id.* at 798–99. An act or omission qualifies as the cause-in-fact of an injury if it was a substantial factor in producing the injury and, without it, the harm would not have occurred. *Id.* at 798. However, where a defendant's conduct does no more than create a condition which makes injury possible, the cause-in-fact requirement is not satisfied. *Id.* at 799. The test for foreseeability is whether a person of ordinary intelligence should have anticipated the harm resulting from the negligent act or omission. *Doe v. Boys Club of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995).

The Court concludes that the Bankruptcy Court's findings that there was "a lack of credible evidence to establish damages, if any, that would have resulted from any booster station design flaws if Kistenmacher had the obligation to design it" is not clearly erroneous. The Bankruptcy Court concluded that the delay in the booster station was "but one of many problems facing this subdivision." FFCL at 32. The record is replete with evidence that the development suffered from severe financial and planning issues independent of the booster station. There was substantial evidence that Cumbre was suffering finan-

---

**5.** Specifically, Cumbre appeals the following negligence related findings and conclusions: (1) "Did the Honorable Bankruptcy Court err in its Findings and Conclusions that Appellees were not negligent in regards to the booster station?"; (2) "Did the Honorable Bankruptcy Court err in its Findings that the disapproval of the booster station by the TNRCC was not a proximate cause of the failure of the development?"; (3) "Did the Honorable Bankruptcy Court err in concluding that there was no credible evidence of damages?"

cial difficulties long before the booster station became an issue.

It is not disputed that the Woodahl company failed to pay Kistenmacher or KEC for their work on the La Elegancia project. Adversary Hr'g Tr. vol. 1, 14; Kistenmacher's Ex. 1. This trend of nonpayment continued in the Cumbre project. *See* Kistenmacher's Ex. 5 (January 24, 1999 letter from Woodahl to Kistenmacher recognizing Cumbre's failure to pay Kistenmacher); Kistenmacher's Ex. 7 (July 3, 2000 demand letter from KEC to Cumbre for nearly $200,000 worth of outstanding debts); Kistenmacher's Ex. 10 (December 1, 2000 demand memorandum from Kistenmacher and KEC for past debts); Adversary Hr'g Tr. vol. 2, 129 (testimony of Masoud indicating that he also had difficulties obtaining payment for his work on the project). Furthermore, the Bankruptcy Court credited the testimony of Masoud that the main reason the development failed was due to the project's lack of funding, not the booster station. Adversary Hr'g Tr. vol. 2, 105–06. Masoud also indicated that the booster station issue was very close to resolution at the point the bank called in the note. Adversary Hr'g Tr. vol. 2, 105. Additionally, there is substantial evidence of general planning problems with the development. *See* Adversary Hr'g Tr. vol. 2, 107–08; Cumbre's Ex. 37 (testimony of Masoud indicating that the need for a booster station was not even contemplated or budgeted for at the design stage of the project); Adversary Hr'g Tr. vol. 1, 120–26 (testimony of Kistenmacher that the development contained an unforseen amount of rock); Cumbre's Ex. 53A at 77–78 (testimony of Woodahl that the substantial amount of rock delayed the project and cost the project an unidentified amount of money). Furthermore, there is evidence which implicates the PSB's failure to properly seek an exception as the cause of any project delay attributable to the booster station. In fact, it is possible that this litigation could have been avoided if the PSB had properly requested a variance prior to the pump's construction. *See* Cumbre's Ex. 30 (October 3, 2001 letter from the TNRCC to the PSB indicating that the PSB should have requested an exception for the Cumbre booster station); Cumbre's Ex. 34 (January 7, 2002 letter from the TNRCC to the PSB reaffirming that it is the PSB's responsibility, not the developer's, to request an exception); Cumbre's Ex. 53B at 21 (Woodahl's deposition testimony that "if [an exception] had been properly requested, the exception would have sailed").

While the Court recognizes that there is conflicting evidence, none of it rises to the level of leaving the Court with a definite and firm conviction that a mistake has been made. *See Carrieri*, 393 F.3d at 517 (providing the clearly erroneous standard of review). Furthermore, while the booster station may have been *a factor* in producing Cumbre's damages, the record does not support a finding that the Bankruptcy Court clearly erred in finding that the booster station was not a *substantial factor* without which the damages would not have occurred. *Mason*, 143 S.W.3d at 799 (indicating that a defendant's conduct must be a substantial factor in producing a plaintiff's harm to qualify as the cause-in-fact). Accordingly, the Court concludes that the Bankruptcy Court's finding that the booster station was not the proximate cause of the failure of the development is not clearly erroneous.

In conclusion, the Court affirms the Bankruptcy Court's determination that Kistenmacher and KEC were not negligent with regard to the booster station. Kistenmacher and KEC did not owe Cumbre a contractual duty to design the booster station. In fact, it is questionable whether Kistenmacher and KEC assumed

any such responsibility. Irrespective of any duty, the Court affirms the Bankruptcy Court's finding that Cumbre failed to demonstrate that the design of the booster station proximately caused any claimed damages to the development.

## C. Promissory Note

 The third issue appealed is whether the Bankruptcy Court erred in awarding Kistenmacher or KEC any money under the July 25, 2000 Promissory Note based on its determination that the Promissory Note was not subject to a condition precedent. Under Texas contract law, a condition precedent is " 'an event that must happen, or be performed, before a right can accrue to enforce an obligation.' " [6] *Bott v. J.F. Shea Co., Inc.,* 388 F.3d 530, 534 (5th Cir.2004) (quoting *Centex Corp. v. Dalton,* 840 S.W.2d 952, 956 (Tex.1992)). To determine if a condition precedent exists, a court examines the parties' intent as expressed in the contract. *Interstate Contracting Corp. v. City of Dallas, Tex.,* 407 F.3d 708, 727 (5th Cir. 2005) (citing *Criswell v. European Crossroads Shopping Center, Ltd.,* 792 S.W.2d 945, 948 (Tex.1990)). Typically the parties must use express conditional language such as "if," "provided that," "on condition that," or similar terms to sustain a finding of a condition precedent. *Id.* (citing *Criswell,* 792 S.W.2d at 948). While express conditional language is not a requirement for a finding of a condition precedent, "its absence is probative of the parties [sic] intention that a promise be made, rather than a condition imposed." *Criswell,* 792 S.W.2d at 948. Generally speaking, the law disfavors conditions due to the harsh nature of their results. *Interstate Contracting Corp.,* 407 F.3d at 727.

 Considering the language used by the parties, the Court concludes that the July 25, 2000 Promissory Note was not subject to a condition precedent. Cumbre asserts that the language "according to the Agreement of July 25, 2000" in the Promissory Note indicates that the parties intended that Cumbre's payment on the Promissory Note be conditioned on Kistenmacher's performance under the July 25, 2000 Agreement. Cumbre's Br. 28. There is nothing inherent in this phrasing which supports Cumbre's argument. *See Criswell,* 792 S.W.2d at 948 (stating that when the parties' intent is ambiguous, courts will not interpret contractual terms to create conditions). The Promissory Note does not contain the type of express conditional language favored by courts before finding a condition precedent exists. *See id.* (noting that parties typically must include language such as "if," "provided that," or "on condition that" to unambiguously create a condition). Rather, the Promissory Note language expressly contradicts the argument that Cumbre's payment obligation is subject to a condition by including a specific maturity date—July 25, 2001. As the Bankruptcy Court aptly noted, the one year maturity date is not limited by any anticipated amount of time that it would take for Kistenmacher and KEC to complete their performance under the July 25, 2000 Agreement. Accordingly, due to the lack of express conditional language and the presence of an express and unlimited maturity date, the Court affirms the Bankruptcy Court's conclusion that the July 25, 2000 Promissory Note was not subject to a condition precedent.[7]

6. In Texas, a promissory note is "a simple contract governed by the fundamental rules applicable to contract law." *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 588 (Tex.App.— Houston [14th Dist.] 2000, no pet.) (internal quotation omitted). Accordingly, general principles of contract law apply to the interpretation of a promissory note.

7. Furthermore, while Cumbre did not argue this point, the Court notes that there is noth-

## V. CONCLUSION

In conclusion, the Court affirms the Bankruptcy Court's decision that Kistenmacher and KEC did not breach the July 25, 2000 Agreement. Furthermore, the Court affirms the Bankruptcy Court's decision that Kistenmacher and KEC were not negligent with respect to the design of the booster station. Finally, the Court affirms the Bankruptcy Court's finding that Cumbre is obligated to pay Kistenmacher and KEC under the July 25, 2000 Promissory Note because it is not subject to any condition precedent.

Accordingly, **IT IS ORDERED** that Appellant Cumbre Development Corporation's Appeal from the October 28, 2004 Judgment of the United States Bankruptcy Court for the Western District of Texas of is **DENIED**.

**IT IS FURTHER ORDERED** that the October 28, 2004 Judgment of the United States Bankruptcy Court for the Western District of Texas is **AFFIRMED**.

**IT IS FURTHER ORDERED** that the above-captioned cause is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that any and all remaining pending motions are hereby **DENIED AS MOOT**.

**IT IS FINALLY ORDERED** that the Clerk shall close this matter.

ing in the July 25, 2000 Agreement, referenced by the Promissory Note, which indicates that payment of the Promissory Note is conditioned on Kistenmacher or KEC's performance under the contract. Rather, the July 25, 2000 Agreement simply memorialized the parties' understanding regarding the amount owed by Cumbre to Kistenmacher and KEC as of June 30, 2000 and created a payment schedule for past debts and future invoices. Kistenmacher's Ex. 9.